# United States Court of Appeals
## For the First Circuit

Nos. 10-1434
     11-1416
     12-1538
     12-1711

UNITED STATES OF AMERICA,

Appellee,

v.

SONIA N. FLORES-RIVERA, a/k/a Mimi; SANDRA I. FLORES-RIVERA,
a/k/a Sandy; CARLOS OMAR BERMÚDEZ-TORRES, a/k/a Omar Moreno-
Espada; CRUZ ROBERTO RAMOS-GONZÁLEZ, a/k/a La R, a/k/a El Gordo,
     a/k/a El Galán, a/k/a Robert Belleza, a/k/a Crucito,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Linda Backiel for appellants Sonia N. Flores-Rivera and Cruz
Roberto Ramos-González.
     H. Manuel Hernández for appellant Sandra I. Flores-Rivera.
     Rafael F. Castro Lang for appellant Carlos Omar Bermúdez-
Torres.
     Dina Ávila-Jiménez, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson
Pérez-Sosa, Assistant United States Attorney, Chief, Appellate
Division, and Juan Carlos Reyes Ramos, Assistant United States
Attorney, were on brief, for appellee.

May 22, 2015

**KAYATTA, Circuit Judge**. These consolidated appeals arise from a multi-count indictment alleging that the four appellants-- Sonia Flores-Rivera ("Sonia"), Sandra Flores-Rivera ("Sandra"), Carlos Omar Bermúdez-Torres ("Omar"), Cruz Roberto Ramos-González ("Ramos")--and their forty-three co-defendants[1] participated in a far-reaching drug trafficking conspiracy throughout various parts of eastern Puerto Rico. Following their joint trial, the appellants were convicted and sentenced to prison terms ranging from 151 months to life. They assign error to many facets of their trial, sentencing, and post-trial proceedings.

Ramos and Omar contend that the district court erred in denying their motions for a new trial based on the prosecution's failure to disclose material evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). We agree that, cumulatively, the withheld evidence had a "reasonable probability" of changing the result for those two appellants. See United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001). We therefore remand their cases to the district court for a new trial. Sonia and Sandra press no Brady claims on appeal. Finding no reversible error arising from the claims that they do bring, we affirm their convictions and sentences.

---

[1] The other indicted co-defendants pled guilty either before or during trial.

## I. Background

### A. The Charged Conspiracy

A grand jury indicted the appellants and their co-defendants on August 2, 2007, on charges of conspiring to distribute, and aiding and abetting the distribution of, cocaine, crack-cocaine, heroin, and marijuana within 1,000 feet of a public housing project or a public school, see 21 U.S.C. §§ 841(a)(1), 846, 860 and 18 U.S.C. § 2 (counts one and three through six), in addition to possessing firearms in furtherance of those crimes, see 18 U.S.C. § 924(c)(1)(A) and (o) (count two).[2]  On February 5, 2008, the grand jury returned a superseding indictment bringing additional charges against Ramos and five other defendants for bribing and tampering with a government witness (counts seven through nine) in violation of 18 U.S.C. § 1512(b)(1) and (k); id. § 201(b)(3); and id. § 2 (hereinafter "the witness tampering counts").  Prior to trial, the district court granted the prosecution's motion to dismiss the witness tampering counts without prejudice so that those charges could be tried separately.

---

[2] Count ten alleged the defendants' joint and several liability for forfeiture of $10 million, as authorized by 21 U.S.C. § 853.  The parties later agreed at trial that the evidence only supported up to $3 million, so the judge instructed the jury that the $10 million shown in the verdict form "should be reduced to $3 million at the most."

**B.    The Evidence**

In considering a challenge to the sufficiency of the evidence following a trial by jury, we typically recite the relevant facts in the light most favorable to the jury's verdict. See United States v. Bayes, 210 F.3d 64, 65—66 (1st Cir. 2000). Conversely, our precedent manifests a lack of consensus on how to present the record when a challenge is lodged to other issues, such as claims of prejudicial error.  See United States v. Burgos-Montes, No. 13-2305, slip op. at 2—3 & n.1 (1st Cir. May 13, 2015).

Given that we cannot simultaneously recite the facts in more than one manner, we first provide a more or less neutral summary of the key relevant evidence presented at trial.  In our subsequent analysis of each issue we adopt a Rashomon-like approach to our view of the evidence depending on the precise question posed by the applicable principles of substantive law.  For example, if a prosecution witness plausibly says "X" and a witness favorable to the defense plausibly claims "not X," we may initially recite both but, in considering the sufficiency challenge, we assume "X" to be correct.  Conversely, on the Brady challenges, the key question posed is whether the unproduced evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  United States v. Avilés-Colón, 536 F.3d 1, 19 (1st Cir. 2008) (internal quotation marks omitted). Answering this question requires that "[w]e evaluate the strength

-4-

of the impeachment evidence and the effect of its suppression in the context of the entire record." Id. (alteration in original) (internal quotation marks omitted). Thus, in the hypothetical example posed above, and with omitted evidence in the form of documents calling into question the credibility of the prosecution witness, we do not assume "X" to be correct; rather, we consider the evidence as a whole to gauge the impact that the documents would likely have had on the jury in weighing the evidence.

The appellants were tried before a jury in October and November of 2009. The prosecution's witnesses told of a wide-ranging conspiracy led by Ramos and staffed by his cadre of "lieutenants" (including Omar), "sellers" (including Sandra), and "runners" (including Sonia).

The prosecution's star witness was Harry Smith Delgado Cañuelas ("Delgado"). Upon his release from prison in 2004, Delgado moved to the Victor Berríos Public Housing Project ("Victor Berríos") in Yabucoa, Puerto Rico. He testified that brothers Alex and Ramiro Nazario controlled heroin sales at Victor Berríos in 2004, whereas Ramos controlled crack, cocaine, and marijuana distribution. Delgado said that, while working for the Nazario brothers, he learned where Ramos's organization hid its drug inventory, and he stole a large packet (a "muerto") of Ramos's drugs. Ramos, he said, suspected him of taking the "muerto," and hired Delgado with the intent to later kill him after Ramos

purchased control of the heroin drug point from the Nazario brothers in 2005. But after seeing how effectively Delgado was "building up" heroin sales under Omar's supervision, Ramos decided Delgado was more valuable to him alive than dead.

Delgado explained that his role as a lead administrator at Victor Berríos gave him an insider's view of the organization's leadership. Omar and two other defendants acted as "order sergeants" in carrying out Ramos's commands whenever a problem arose at a Ramos-owned drug point. Delgado also recounted how Ramos kept tabs on competitors who sought to establish other drug points near Victor Berríos.

Delgado's additional role as a seller provided insight into the organization's day-to-day operations as well. He testified that Sonia was a "runner" for the Victor Berríos drug point. When a seller's supply ran low, Sonia would fetch drugs from Ramos's inventory and deliver them to the seller. After another individual finished tallying drug sales, Sonia stashed away the proceeds until one of Ramos's lieutenants picked up the money. Sandra, meanwhile, served as both a runner and a seller of cocaine, crack, and marijuana. Two other cooperating witnesses, whose testimony is described below, painted a similar picture of Sandra's role.

Delgado claimed that his employment with Ramos's organization continued until 2007, when he was arrested for

attempted murder in Yabucoa. Delgado soon thereafter began cooperating with the government.

Xiomara Berríos-Rojas ("Xiomara") was the government's second cooperating witness who claimed to have been a member of the conspiracy. Xiomara testified that she began working for Ramos's organization at Victor Berríos in or around 2004, selling marijuana, crack, and cocaine. She testified that certain notebooks, seized by the police from an apartment belonging to one of Ramos's lead bookkeepers at Victor Berríos, included "tallies" reflecting the accounting of drug sales. Xiomara also testified that a video depicting Sandra and Sonia at Victor Berríos showed them dispensing crack, although no drugs were visible in the footage. And she agreed with Delgado's testimony that Sonia was a "runner" for Ramos.

The third cooperating witness to testify was Andy Marcano ("Andy"). Andy, like Xiomara, was a "runner." He delivered heroin and other drugs to various drug points, including Victor Berríos. Andy said that he also accompanied Ramos and his lieutenants when it became necessary to threaten competitors or discipline the organization's members.

Andy explained that Omar cooked heroin for the organization and acted as one of Ramos's lieutenants. After preparing the heroin, Omar gave it to Andy or another runner, who then delivered it to sellers such as Delgado.

Central to the defendants' (in particular, Ramos's) trial strategy was an attempt to impeach Delgado, Xiomara, and Andy by suggesting that they engaged in a coordinated effort to fabricate their testimony. Leading up to the trial, the three witnesses were housed in a unit for cooperators within the Metropolitan Detention Center (MDC) in Guaynabo, Puerto Rico. Within the cooperators' unit, the men were located in section 4-C ("4-Charlie"), and Xiomara resided in section 3-C, "right below" 4-Charlie. Xiomara admitted it was possible for the cooperators to talk to prisoners in other cells through the plumbing system by removing water from each cell's toilet bowl.

On the stand, all three witnesses admitted speaking to each other at MDC, but they flatly and firmly denied discussing anything involving the instant case. Asked by Ramos's counsel whether he discussed the case with Andy, Delgado responded: "No . . ., from the beginning when I arrived [at 4-Charlie] in 2007, the order is that you cannot talk about the cases with anybody, anybody, nobody, nobody." Similarly, while admitting that she spoke to Delgado "on several occasions," Xiomara denied ever speaking to him after she began cooperating with the government, and she also denied that Delgado convinced her to testify or that they discussed their testimony with one another. Andy, too, admitted to speaking to Delgado at 4-Charlie. But when asked on cross-examination whether he "at any time discuss[ed] [his]

testimony or the facts of this case with Harry Delgado," Andy replied, "No. It is totally prohibited to us to talk about the case."

One might think that in this case charging a conspiracy covering so much time, geography, and wrongdoing, the prosecution (perhaps with the assistance of the cooperating witnesses) would have offered a great deal of other evidence that did not depend on, and indeed corroborated, the testimony of its cooperating witnesses. One would be wrong. The government points us to no such evidence of any significant probative value, especially as it might bear on Ramos and Omar.

Government agents did explain how they set up secret cameras, and seized computers, cell phones, and notebooks. They also explained how they caught a number of other individuals red-handed at Victor Berríos. None of this evidence, though, directly implicated Ramos or Omar, and none of the other individuals who were implicated testified.

After a thirteen-day trial, the jury found Ramos and Omar guilty on all six counts charged in the superseding indictment. The government dismissed the firearms charge against Sonia and Sandra prior to jury deliberations, but the jury returned a guilty

verdict against those two appellants as to the five remaining drug trafficking counts.[3]

At the close of their respective sentencing hearings, the district court sentenced the appellants to the following terms of imprisonment:  Sonia, 151 months; Sandra, 240 months; Omar, 480 months; Ramos, life imprisonment.  Each of the four appellants timely appealed their convictions and sentences, but intervening events arising from the severed counts of witness tampering against Ramos delayed their appeals from reaching this Court for several years.

## II.  Ramos and Omar's Brady Claims

At some unspecified time before the trial of this case, Delgado sent the lead prosecutor a handwritten letter that was, on its face, a document that the prosecutor was required to disclose to defense counsel prior to trial.  The prosecutor did not make this disclosure.  Instead, she recounts that she put a copy of the letter in her file for the separate trial on the witness tampering charges against Ramos, and forgot about it even as she tried this case in which Delgado was, in her words, her star witness.  She then came across the letter after the trial of this case when preparing to try the witness tampering case.  The prosecutor also managed not to provide defense counsel prior to the verdicts a

---

[3] The jury also found all four appellants guilty of the forfeiture counts.

-10-

series of notes Delgado kept, or notes taken by FBI agents during their interviews with another indicted co-conspirator, Gabriel Medina-Pabon ("Medina"). The belated production of these materials set off a series of post-trial evidentiary hearings and motions by Ramos, Omar, and Sandra. The district court, in four separate opinions issued between 2010 and 2013, rejected the appellants' various arguments for a new trial based on the belated productions. Those four opinions provide a detailed account of each of the hearings conducted by and motions submitted to the district court. See United States v. Ramos-González, 747 F. Supp. 2d 280, 284—89 (D.P.R. 2010); United States v. Ramos-González, No. 07-318, 2011 WL 2144215, at *1—2 (D.P.R. May 31, 2011); Opinion & Order, ECF No. 2648 at 1—3, July 30, 2012; Opinion & Order, ECF No. 2972 at 1—6, August 9, 2013. We describe the details of the withheld evidence and the district court's reasoning.

**A.    The Withheld Evidence**

### 1.    Delgado's Letter to the Prosecutor

The evidence of Delgado's letter to the prosecutor consisted of two photocopied pages of handwritten text. The certified translation of the letter states as follows:

> To: The Prosecutor Dina Avíla Jímenez
> From: The best cooperator, Harry S. Delgado
>
> Hello!
>
> I hope under God Almighty that when you receive the foregoing in your hands, you enjoy perfect health together with your co-workers

-11-

and relatives.  It is my best wish from the bottom of my heart.

About me, I tell you that [illegible], I am well health-wise.

I will start by saying that this is to let you know to please remember these 2 things, the first is that Jeanette[4] is on probation and before she leaves the country, to clarify that point of view, because otherwise, they'll deem her as a fugitive and they may take away my daughters, and that would kill me, please clarify this thing of the probation first; and the second thing, I need an order from the Judge so that when they transfer me Jeanette can visit me, remember that I am not legally married, and to get visits you have to fill in a paper that you have to put your home and the criminal record and it is not convenient for any jail to know where Jeanette lives, what we want is that the least they know, the better, please help me, I am doing everything for my daughters and Jeanette.  I need you to help me please.  I promised you, the last time we saw each other, to do everything you said and I have done it to the point that you know how this has gotten, we have more than we expected, more evidence and more strength for the case, I hope you can help me, I will

The photocopy of the letter is cut off after "I will"  at the end of the letter's second page.  The prosecutor reports that when she re-discovered the letter after the trial, she asked the FBI agents to "go through each . . . folder or envelope to see if they could find the original," but they were unable to find it. Ramos-González, 747 F. Supp. 2d at 286—87.  The prosecutor said that the agents could not find any other materials related to the letter, and she denied destroying any part of the letter herself or

---

[4] Jeanette was Delgado's conjugal partner.

-12-

instructing the agents to destroy part of the letter. The district court was unable to definitively determine whether additional pages were missing from the letter and, if so, how such pages may have disappeared. Id. at 284.

## 2. Delgado's Toilet Conversation Notes

Delgado made notes of two conversations with Andy and Medina on the night of December 9, 2008, one at 8:57 p.m. and the other at 9:18 p.m. Id. at 287. Those conversations took place through the "toilet system" at MDC, id. at 287, where, as we mentioned above, Delgado, Xiomara, Andy, and Medina were all incarcerated leading up to the drug trafficking trial.

The notes reflect that Andy and Medina attempted to curry favor with Delgado (who they presumably knew was the lead cooperator) and to downplay their own roles in the conspiracy. According to the notes, Medina said: "Look [Delgado], I'm calling to tell you that I am cooperating in the case with the prosecutor and I know you are getting [Xiomara] ready. . . . Andy and I are going to cooperate, I already started to cooperate." Medina then questioned Delgado as to why the government was "plac[ing] [him] at the [drug] point when you know that I wasn't working there." Andy also denied being an "enforcer." Delgado replied: "You very well know that you were dealing," and proceeded to remind Medina of a time when he assisted Delgado with storing guns. The rest of the

-13-

conversation basically reiterated Medina's pleas to Delgado to treat him well in prison.

Delgado's notes also relate a later conversation between Delgado and Andy that had a similar tenor to Delgado's conversation with Medina. Andy asked why the government had him "down as an enforce[r]." Delgado replied: "Listen, you know that I know about your situation, and to tell you a little something, do you remember the meeting in Caguas, where you, [Ramos], Manolo, [Bam Bam], Eddie, Omar, and the others were there?" Andy said: "Yes, yes, yes, it's true, but I'm going to cooperate and I'm going to bring down all of those who stayed behind," and, "What I want is that when we go up there, for us not to be enemies, but friends, and be only [one], so we can help each other." They then agreed to talk to each other again the following day at 8:00, but there are no notes of any subsequent conversations on the record. At some point the prosecutor, according to her testimony at a post-trial proceeding, "scolded" Delgado for making the notes after he turned them in and ordered him to stop making them.

### 3.    "Rough Notes" of Interviews with Medina

FBI agents interviewed Medina three times in November and December 2008 about the drug conspiracy, but Medina never testified at trial. The prosecutor turned over the FBI "302 Reports" (the FBI's official notes of what was said during the interviews) prior to trial, but she withheld "rough notes" transcribed by one of the

interviewers, FBI Special Agent Carlos Barreiro. The rough notes were finally disclosed to defense counsel in September 2012 at one of the post-trial evidentiary hearings involving allegations by Ramos and Omar that the government intimidated Medina, causing him not to testify on behalf of Ramos at an earlier post-trial hearing. These notes, including the Spanish version and English translation, span 121 pages of our appellate record.

The rough notes' content largely overlaps with the information in the disclosed 302 Reports. However, Omar, whose motion for a new trial on the basis of these notes was joined by Ramos, argued before the district court that the rough notes contained various new pieces of exculpatory impeachment evidence. For example, the notes stated that Andy and another individual "tapped Xiomara's [phone] line and listened to conversations between her and [Delgado]" in prison. Medina also omitted any mention of Omar's involvement within the time period in the indictment (the only mention of Omar concerned events occurring in 1999), which Omar argued below and on appeal is "totally exculpatory" as to him. And Medina inferred that Delgado murdered a man known as "Barquilla," even though Delgado denied having anything to do with that murder while on the stand.

## B.   The District Court Opinions

In a series of four detailed opinions, the district court rejected all arguments that the above-described evidence was

-15-

sufficiently impeaching or exculpatory to warrant a new trial. The court concluded that, had the defense possessed the evidence prior to trial, none of it would have had a "reasonable probability" of changing the result.[5] In the first opinion, the court made a preliminary finding that "the evidentiary hearing allowed the Court to gauge [the prosecutor's] testimony as credible and supportive of her avowal of good faith in belatedly disclosing the evidence by reason of inadvertence." Ramos-González, 747 F. Supp. 2d at 287. As for the evidence's materiality, the court found that:

> The evidence . . . [was] principally aimed at impeaching Delgado's credibility and bias in favor of the government, issues that were already opened at trial and closed shut by the jury. . . . Beyond the smokescreen of factual allegations attacking Delgado's credibility, which were in large part previously decided by the jury, Defendants have not pointed to a single piece of material evidence that undermines the guilty verdicts, especially when substantial evidence corroborates their participation in the drug trafficking conspiracy.

> Id. at 292.

With regard to Delgado's letter, the district court pointed out that the defendants had in their possession, before trial, information showing Delgado's receipt of benefits from the government, including assistance with relocating his family. Id. at 293. Moreover, Delgado admitted on direct examination that his

---

[5] We discuss the applicable legal standard in greater detail in Part 1.C, below.

family received close to $10,000 from the FBI for his cooperation, and the court warned the jurors that Delgado's receipt of such benefits could affect his veracity and should be considered in judging his credibility. Id. Therefore, the district court concluded that the letter, "stripped to [its] bare essentials, . . . say[s] nothing more than what has already been said about Delgado at trial" and the attempt to impeach Delgado with the letter could "only be described as cumulative." Id. at 294.

Similarly, the court found that Delgado's conversations with Andy and Medina as reflected in Delgado's notes fell "into the same general category of cumulative or collateral impeachment evidence failing to create a reasonable probability of acquittal." Id. at 294. The court explained that the notes "simply reflect conversations by two co-defendants who were either contemplating cooperating or already decided upon cooperating with the Government. In essence, [Andy] and Medina [were] attempting to exculpate themselves, not Defendants, from playing major roles in the drug conspiracy, and are attempting to curry favor with Delgado . . . such that he would treat them fairly when they would arrive and reside together at the cooperator's [sic] unit." Id. at 295. The court "fail[ed] to see how the conversations [between the cooperators] were clearly related to the drug trafficking charges in the sense that the cooperators were discussing any key material factual allegations relating to [the appellants'] participation in

-17-

the conspiracy and guilt." Id. at 296. Thus, this evidence, too, was "collateral because [it did] not exculpate Defendants in any way, and, [it was] cumulative because the fact that the cooperators spoke in prison . . . was subject to extensive cross-examination at trial." Id.

With respect to the rough notes (which were not produced until 2012, two years after the court issued its first post-trial opinion), the court again concluded the evidence was both collateral and cumulative. As a general matter, Medina's testimony at a 2012 hearing for the government's alleged prosecutorial misconduct, while still inculpating the defendants, conflicted with many of the statements reflected in the rough notes. Thus, the probative force of his pre-trial statements was weak, and the notes of those interviews did "little, if nothing at all, to undermine the confidence of the verdict against the defendant." In response to Omar's claim that the absence of any mention of his involvement in the rough notes during the period included in the indictment was "totally exculpatory" to him, the court concluded that such an absence was at best neutral and therefore immaterial.

Finding that "the undisclosed evidence was neither new or [sic] exculpatory, but was collateral and cumulative," and that

"the government did not engage in any misconduct," the court denied the defendants' final motion for a new trial.[6]

## C.    Standard of Review for the Denial of a New Trial

On appeal, only Ramos and Omar renew their contentions that the withheld evidence warranted a new trial, so we evaluate the Brady issue solely with respect to them.[7]

The appellants brought their new trial motions under Federal Rule of Criminal Procedure 33, which provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  We review the district court's denial of a Rule 33 motion for "manifest abuse of discretion."  González-González, 258 F.3d at 20.

As this circuit has previously explained, motions for a new trial based on newly discovered evidence generally require a

---

[6] The court's denial of the defendants' motion to dismiss the indictment due to the government's alleged prosecutorial misconduct is not at issue in this appeal.

[7] Sandra's trial counsel joined Ramos and Omar in petitioning the district court for a new trial after the prosecutor turned over Delgado's letter and notes in 2010.  Her appellate counsel has not renewed this claim on appeal.  Counsel was clearly aware of his ability to adopt a co-appellant's arguments in a consolidated case pursuant to Federal Rule Appellate Procedure 28(i), since he reserved his right to do so in Sandra's opening brief.  But counsel never filed a reply brief after the court granted him an extension, nor did he make a motion to adopt the other appellants' arguments.
Sonia did not make a motion for a new trial below and does not attempt to piggyback on her co-appellants' motions on appeal, even though her appellate counsel was clearly aware of the Brady issue, since she is also representing Ramos in this appeal.  Sonia's opening brief includes a footnote referencing Delgado's letter but makes no argument in relation to it.

four-pronged showing that: "(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant."  Id. (quoting United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980)).  However, when the basis for the motion is that the government failed to disclose evidence required to be disclosed under Brady, either willfully or inadvertently, we apply the more defendant-friendly Kyles v. Whitley standard to the test's third and fourth prongs.  See Kyles v. Whitley, 514 U.S. 419, 434 (1995); United States v. Josleyn, 206 F.3d 144, 151—52 (1st Cir. 2000).  Instead of requiring that the defendant show that an acquittal would have "probably" resulted had the material been produced, we require only that the defendant show a "reasonable probability" that had the government disclosed the evidence prior to trial, the result of the proceeding would have been different.  González-González, 258 F.3d at 20.  Answering that question requires that we determine whether a trial held in the absence of such evidence can be described as a trial that can produce "a verdict worthy of confidence."  Id. (citing Kyles, 514 U.S. at 434).  "This somewhat delphic 'undermine confidence' formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would

-20-

produce an acquittal." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005) (internal quotation marks omitted).

**D.  A Preliminary Note**

We pause here to acknowledge that this is not the first time our circuit has referenced the district court's 2010 opinion rejecting Ramos and Omar's request for a new trial based on Delgado's letter and toilet conversation notes.[8]  In United States v. Ramos-González, 775 F.3d 483, 509—10 (1st Cir. 2014) (which we will call "the possession case" for purposes of this discussion), we affirmed Ramos's conviction for a separate drug offense.[9]  One of Ramos's arguments in his appeal from the possession case conviction was that the indictment against him should have been dismissed, in part because the prosecutor also failed to timely disclose certain 302 Reports of interviews with Ramos's arresting officers.  Id. at 491–92.  To buttress his claim of prosecutorial misconduct in that case, Ramos pointed out that the prosecutor in that case was the same one who also failed to timely disclose the above-described letter and notes from Delgado in the instant conspiracy case.  Id. at 492.  Ramos urged us to find that the

_____

[8] Because the prosecutor did not disclose the rough notes until 2012, they were not addressed by the district court until 2013.

[9] We also remanded the possession case for resentencing in light of the district court's erroneous application of the career offender enhancement under the sentencing guidelines.  Id. at 487, 503–08.

-21-

prosecutor's actions, considered cumulatively in the two cases, amounted to a "recurrent pattern of concealment and deception" and a "flagrant disregard for [his] constitutional rights" that warranted a dismissal of the indictment in the possession case. Id.

We rejected that argument. After explaining why the prosecutor's failure to disclose the 302 Reports in the possession case itself did not constitute "an extreme case of prosecutorial misconduct," id. at 493, we addressed Ramos's argument based on the cumulative conduct in the two cases. In so doing, we "express[ed] concern about the repeated nondisclosure of evidence" in the prosecutions against Ramos and noted that "[t]he United States Attorney's Office should develop procedures to avoid repeating the lapses that occurred in these cases." Id. at 494. Nevertheless, we affirmed the verdict in the possession case and made the following statement regarding the ruling in this case that is now the subject of this direct appeal:

> As an initial matter, the district court in the conspiracy case took the defendants' Brady claims seriously, conducted an evidentiary hearing, and wrote a thoughtful opinion explaining why the alleged violations there did not warrant a new trial. Given such careful treatment, that court's judgment that no constitutional violation occurred in the trial over which it presided is owed deference by both the district court in the instant case and by us on appeal.

Id. at 493-94 (internal citation omitted).

-22-

So we must first ask whether the above-quoted language dictates the resolution of the Brady issue on this direct appeal. For the following reasons, we think not.

First, the precise question posed in the possession case trained on the conduct and good faith of the prosecutor. The argument posed was that misconduct in one case supported a finding of misconduct in another, or that two errors could not be explained as innocent. To reject that argument, it was sufficient to defer to the district court's finding that the prosecutor did not act in bad faith. As we will explain, there is no need to revisit that finding on this appeal.

Second, and relatedly, in its collateral discussion of the district court ruling in the instant case, the prior panel (which included one of the judges on this panel) simply did not have the complete record. This appeal in this case is the first appellate opportunity to examine the above-described Brady material and to analyze its potential effect on the appellants' drug conspiracy convictions. We re-emphasize, and this is critical, that the dispositive inquiry in determining whether a defendant is entitled to a new trial under Brady is whether there is a "reasonable probability" that the newly discovered evidence would result in an acquittal in this case. Since we have never before looked at the full record to determine whether Delgado's letter and notes would have any effect on the jury's finding in the instant

-23-

conspiracy case, our deferential statement that the district court's 2010 opinion was "careful" and "thoughtful" contains limited, if any, value to us in deciding Ramos and Omar's claims.

We proceed with our analysis.

**E.   Analysis**

The district court did indeed recite with care and thought the correct standards and, as we have summarized above, it issued detailed opinions rejecting the appellants' arguments. Nevertheless, we disagree with the district court's ultimate conclusion that the withheld evidence, considered cumulatively, lacked sufficient materiality to create a "reasonable probability" of acquittal had it been disclosed.  Our disagreement is strong enough to overcome the considerable deference we must yield to a trial court on such decisions.

We begin with the well-established principle that, under Brady, the government has an "affirmative duty to disclose evidence favorable to a defendant," be it exculpatory or impeachment evidence. Kyles, 514 U.S. at 432—33.  However, "[w]e do not . . . automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." United States v. Dumas, 207 F.3d 11, 15 (1st Cir. 2000) (quoting Giglio v. United States, 405 U.S. 150, 154 (1972) (internal quotation marks omitted)).  The following guidance on materiality

compiled from Supreme Court and First Circuit precedent is particularly instructive with respect to the newly discovered evidence in this case:

> In analyzing whether there was a <u>Brady</u> violation, we evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality. The import of withholding evidence is heightened where the evidence is highly impeaching <u>or</u> when the witness' testimony is uncorroborated and essential to the conviction. . . . We must grant a new trial if, after assessing the significance of the non-disclosed evidence in the context of trial, the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Avilés-Colón</u>, 536 F.3d at 19 (internal quotation marks and citations omitted) (quoting, inter alia, <u>Strickler</u> v. <u>Green</u>, 527 U.S. 263, 290 (1999) and <u>Kyles</u>, 514 U.S. at 435).

Applying this test, we observe, first, that the testimony of the three cooperating witnesses--especially Delgado--was both essential to the convictions and uncorroborated by any significant independent evidence. Indeed, the absence of such evidence is so marked and surprising in view of the resources devoted to the investigation and the availability of three turned conspirators that it could reasonably cause the factfinder to be dubious about the witnesses' claims. This is therefore a case in which the <u>Brady</u> material that was not produced need not be "highly impeaching" in

-25-

order to require that the verdict be reversed.  <u>Avilés-Colón</u>, 536 F.3d at 19.

Delgado was the star witness.  The prosecutor told us so much at oral argument and emphasized Delgado's testimony throughout her closing argument at trial.  His direct examination lasted an entire day, and his cross, re-cross, and re-direct examination lasted a day and a half more.  On cross, defense counsel worked through the usual litany of attacks one might make on any cooperating witness.  Delgado parried any suggestions that his testimony was orchestrated with that of the other witnesses.  In fact, he denied even talking about the case with them, telling the jury that to do so was against the rules.  So, too, did those other two cooperating witnesses firmly deny a basic premise of the defense: that they coordinated their testimony.

Had defense counsel possessed Delgado's notes, counsel could have either shown Delgado and the others to have perjured themselves, and/or forced them to admit that they had at the very least compared prospective testimony with one another.  The notes indicate that Delgado was encouraging Andy and Xiomara to testify, and recount in detail at least one conversation where Delgado "reminded" Andy about a meeting involving Ramos and Omar, which a jury could have interpreted as Delgado telling Andy what to say.  Similarly, the rough notes show that Andy knew that Delgado and Xiomara were talking through the pipes.  It was not just the

defense who believed the potential for the cooperators to talk about the case in prison jeopardized the government's chances of a conviction.[10] The prosecutor elicited testimony from Andy on re-direct that suggested male and female prisoners could not talk to each other at the prison.[11]

Delgado's letter to the prosecutor is probative for a different reason. Although it contains no fact directly at variance with his testimony,[12] its overall tone turns it into what could clearly have been a focus of a defendant's closing. In the

---

[10] In line with Supreme Court precedent, we decide whether the newly discovered "evidence is material . . . to guilt . . . irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87; see also Kyles, 514 U.S. at 432.

[11] We refer to the following exchange:

> **Prosecutor:** [Defense counsel] asked you whether you and Harry had discussed the facts of this case or the case about your testimony.
> **Andy:** Yes, he asked me that question.
> **Prosecutor:** Sir, what kind of gender inmates are in Four Charlie?
> **Andy:** We are all males.
> **Prosecutor:** So where is Xiomara located?
> **Andy:** The 3 C unit.
> **Prosecutor:** So you and Harry do not share a same unit with Xiomara?
> **Andy:** No.

[12] The letter did contain at least one "new" fact that the defendants lacked at trial but that they could have used for impeachment purposes: Delgado's girlfriend Jeanette, who he references in the letter, was on probation while Delgado was cooperating. Delgado's letter suggests that the government was allowing Jeanette to travel out of Puerto Rico with Delgado's children due to his cooperation.

-27-

letter, Delgado presents himself as the prosecutor's "best cooperator"; a fawning, desperate supplicant willing to "do everything [the prosecutor] said" and eager to point out how much assistance he was providing her. Importantly, the fact that the last part of the letter appears to have been destroyed--the part where it seems he was saying what he would do--heightens greatly its probative value, both raising an inference of spoliation, see United States v. Laurent, 607 F.3d 895, 902 (1st Cir. 2010),[13] and providing a powerful tool in the hands of any good trial counsel to call into question the credibility of both the key witness and, implicitly, the lead prosecutor.[14]

---

[13] Omar argued below and on appeal that the prosecution's failure to preserve the entire letter supported a new trial under Arizona v. Youngblood, 488 U.S. 51, 58 (1988) (holding that bad faith destruction of evidence constitutes a due process violation). In Dumas, 207 F.3d at 15, we explained that in order to obtain a new trial on a Youngblood-style destruction of evidence rationale, "[t]he defendant must show that, in failing to preserve the evidence, the government, (1) acted in bad faith when it destroyed evidence, which (2) possessed an apparent exculpatory value and which (3) is to some extent irreplaceable." While the district court's finding of no bad faith prevented a new trial based on the destruction of evidence rationale alone, the appellants likely would have been entitled to a spoliation instruction, allowing the jury to make an adverse inference that the destroyed evidence was favorable to the defense. See Laurent, 607 F.3d at 902. Thus, the fact that the letter was partially destroyed is of import to our view of the withheld evidence's cumulative effect.

[14] In noting that the apparently incomplete copy of the letter might suggest such an inference, we do not question the district court's conclusion that the non-production was unintentional. We do, however, repeat our concern that this United States Attorney's office, especially given its very heavy workload, appears to need better procedures for gathering and producing Brady materials. See Ramos-González, 775 F.3d at 494.

In deeming all this evidence to be merely "cumulative," the district court twice erred.  First, the district court relied heavily--at least twice--on its observation that the jury believed Delgado based on the evidence it did hear.  But this begs the question of whether the jury would have believed Delgado if it had also heard the omitted impeachment evidence.  Second, the fact that the defense had some tools to attack Delgado's testimony hardly dismisses the potential of different tools as merely cumulative.  If defense counsel had firm proof that a witness received $500 from the government, a letter confirming such a payment would be cumulative.  But a letter revealing another payment of $50,000 would be cumulative only in the sense that its relevance pointed toward the same conclusion.  This type of cumulative evidence can be quite probative.

Here, moreover, there was no other document or recording tending to prove that the witnesses were lying when they denied discussing their testimony with one another.  In so concluding, we have considered the district court's finding that "Ramos' camp was aware of conversations among co-defendants through the toilet at MDC prior to trial."  The district court based this finding upon Medina's post-trial testimony recalling a pre-trial meeting with Ramos's investigator in which he told the investigator that he heard Delgado and Xiomara discussing the case through the toilets.  The investigator also testified and denied such a meeting ever

occurred, but the district court (despite finding Medina not to be a credible witness) nevertheless concluded that the toilet conversations were not "unavailable" to Ramos under the first prong of <u>Brady</u>, and "thus, the motion for new trial must be denied[.]" <u>See</u> <u>United States</u> v. <u>Del-Valle</u>, 566 F.3d 31, 38 (1st Cir. 2009) (to establish a <u>Brady</u> violation, evidence must be unknown or unavailable to the defendant at the time of trial).

We disagree with the district court's analysis. First, a fact "known" to counsel remains entirely unknown to a jury unless counsel has admissible evidence of the fact. There is no evidence that Medina would have been willing to testify at Ramos's trial or that he could have been so compelled. Second, even if Medina had testified at trial, a swearing contest between Medina and Delgado is hardly the same in terms of impeachment value as notes written in Delgado's own hand. <u>See</u> <u>United States</u> v. <u>Paladin</u>, 748 F.3d 438, 446 (1st Cir. 2014) ("[S]uppressed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already . . . impeached at trial by the <u>same kind of evidence</u>." (internal quotation marks omitted)). And in this latter respect, it is noteworthy that in concluding that Medina's testimony lacked a reasonable probability of changing the result at trial, the district court opined that Medina was not a credible witness "considering the numerous inconsistencies in [his] statements." We also reiterate that our holding is based on the cumulative impact

of all of the newly discovered evidence, not solely the content of Delgado's alleged conversation with Xiomara.  See Kyles, 514 U.S. at 420 (explaining that the "disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence considered item by item").

We also recognize that, in some sense, the letter and notes were collateral because they did not directly bear on the factual evidence underlying the government's case.  See id. at 448; United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993) ("A matter is considered collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.'" (quoting 1 McCormack on Evidence § 45, at 169 (4th ed. 1992))).  Yet in another, very important sense, the evidence is anything but collateral because the possibility that the three linchpin witnesses colluded to fabricate incriminating testimony goes to the very core of this case and potentially compromises every piece of factual evidence the government had against Ramos and Omar.

Semantics aside, here is where the rubber meets the road: This was a case that surprisingly pivoted entirely on the credibility of Delgado and his two cohorts.  The unproduced Brady materials were the only evidence that would have eliminated the claim that the testimony was entirely uncoordinated, and the

-31-

Delgado letter would have provided a uniquely colorful tool for both attacking Delgado's motivation and raising the prospect that Delgado and the prosecutor were hiding something from the jury. Many members of the public would pause when told that a jury accepted Delgado's testimony--and convicted Ramos and Omar--without being shown any of these documents. See Norton v. Spencer, 351 F.3d 1, 9 (1st Cir. 2003) ("Confidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction." (internal quotation marks omitted)).[15] We cannot say for sure what Delgado, Xiomara, and Andy would have said had they been confronted with this evidence on the stand (regardless of whether it was introduced on direct or cross-examination). Nor can we say that introduction of the withheld evidence would more likely than not have changed the verdict. But the grasp of our own conviction need not reach so far. Rather, under the applicable standard we need only find it to be "reasonably probable" that the

---

[15] The lack of corroboration of the cooperators' testimony is a critical factor in helping us distinguish this appeal from other cases applying the same legal standard that came out the other way. See, e.g., Paladin, 748 F.3d at 493 (evidence of defendant's guilt was "overwhelming and did not depend on [the informant's] credibility"); United States v. Mathur, 624 F.3d 498, 505 (1st Cir. 2010) (multiple witnesses gave first-hand accounts of being victimized by the defendant, and government introduced physical evidence corroborating defendant's guilt); González-González, 258 F.3d at 18—19 (numerous other witnesses, who were not impeached by the newly discovered evidence, corroborated the impeached witness's testimony, and the government introduced voluminous incriminating documentary evidence of the defendant's guilt).

impeachment evidence would have caused the jury to acquit Ramos and Omar.  See United States v. Prochilo, 629 F.3d 264, 268 (1st Cir. 2011).  These circumstances satisfy that test due to the combined impact of Delgado's solicitous and suspiciously incomplete letter, the toilet conversation notes that the prosecutor scolded Delgado for making, and the FBI's rough notes.  We therefore instruct the district court to grant Ramos and Omar's motions for a new trial.

This finding disposes of Omar's appeal, since any potentially reversible mistakes arising from the other trial and sentencing errors he alleges will be--at least temporarily--cured by our grant of a new trial.  Ramos, however, also makes a sufficiency of the evidence argument with respect to the aiding and abetting counts (counts three through six).  A successful sufficiency claim would oblige us to direct the court to dismiss those counts of the indictment, see Burks v. United States, 437 U.S. 1, 10—11 (1978)--a more severe remedy than a new trial--so we still must analyze that claim despite our ruling on the Brady issue.  As for Sonia and Sandra, neither of them pressed Brady claims before this Court.  We therefore proceed to address Ramos's sufficiency claim and each of Sonia and Sandra's assignments of error below.

### III.  Ramos's Sufficiency Argument

Ramos moved for a judgment of acquittal on all counts based on the insufficiency of the evidence against him at the close

of the government's case, and he renewed that motion post-trial. See Fed. R. Crim. P. 29(a). We review a district court's denial of a Rule 29 motion de novo, viewing the evidence in the light most favorable to the jury verdict and giving equal weight to direct and circumstantial evidence. See United States v. Appolon, 695 F.3d 44, 55 (1st Cir. 2012). "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." Id. (quoting United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010)).

On appeal, Ramos argues only that the trial evidence was insufficient to prove the charges that he aided and abetted the possession with intent to distribute heroin, cocaine, crack-cocaine, and marijuana. When the government alleges that a defendant aided and abetted an illegal act, it must show that the "defendant participated in the venture and sought by [his] actions to make it succeed," United States v. Bristol-Martir, 570 F.3d 29, 39 (1st Cir. 2009) (alteration in original) (internal quotation marks omitted), and that he "willingly took some action to facilitate" the crime, United States v. Bennett, 75 F.3d 40, 45 (1st Cir. 1996). Where the charges arise from a principal's possession with intent to distribute narcotics, "[k]nowledge of the particular controlled substance being . . . distributed is not necessary, and intent to distribute can be inferred from the

-34-

quantity of drugs involved." Bristol-Martir, 570 F.3d at 39 (internal quotation marks omitted).

As we have explained, the prosecution's case was vulnerably perched on the testimony of cooperating witnesses without the support of any independent corroboration. That weakness, though, does not render the evidence insufficient. Indeed, we have repeatedly held that even the "uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible." United States v. Cortés-Cabán, 691 F.3d 1, 14 (1st Cir. 2012) (collecting cases). Considering the evidence in the light most favorable to the government, as we must in analyzing an attack against the sufficiency of the evidence, see Bayes, 210 F.3d at 65—66, we conclude that a rational jury could have found Ramos guilty beyond a reasonable doubt on the aiding and abetting counts. Delgado, Xiomara, and Andy's trial testimony showed that, as the leader of the conspiracy, Ramos established the organization's primacy for all four types of drugs at Victor Berríos by "purchasing" control of the drug point from the Nazario brothers. He also made hiring decisions (such as his choice to retain Delgado as an administrator and seller at Victor Berríos and Andy as a "runner" at various drug points, including Victor Berríos), armed his employees (such as when he provided Delgado with a gun), and constructed a chain of command (by tapping Omar, José Manuel Zavala-Martí, and Bam Bam as

"order sergeants" who "dole[d] out" punishment to those who "failed at something"). Such high-level activities were no less helpful and intentional in furthering the organization's illegal objectives than the actions taken by the sellers and runners themselves. Ramos's sufficiency of the evidence argument therefore fails.

## IV.  Sandra Flores-Rivera's Arguments

### A.    "Other Act" Evidence

Sandra first argues that she is entitled to a new trial because the district court committed error under Federal Rule of Evidence 404(b) by admitting testimony about "prior bad acts." We begin by describing the complained-of evidence.

Near the beginning of Xiomara's direct examination, the prosecutor asked her several questions aimed at lessening the blow of the defendants' anticipated impeachment attempts. For example, the prosecutor elicited Xiomara's admission that she cut off her electronic bracelet while on bail, used drugs while on bail, lied to her parole officer, and fought another prisoner while incarcerated. During this line of questions, the prosecutor asked Xiomara if she had "ever been involved in an incident regarding a knife." Xiomara proceeded to explain that she was placed "in the hole" for seventeen days because prison officials discovered a homemade knife in a co-defendant's cell. The following day, the prosecutor returned to this subject, and Xiomara clarified that it was Lauren Ortiz-Flores, Sandra's niece, in whose cell the knife

was found.  Sandra was not mentioned in connection to this story at all.  On cross-examination, Sandra's trial counsel elicited testimony that during the investigation about the homemade knife, prison officials found a sewing needle in Xiomara's cell.  Prisoners were not allowed to have sewing needles, so this was another instance of Xiomara breaking prison rules.

The second piece of evidence is a story told by Andy during his testimony.  Andy testified that Sandra and her sister Diana (also a co-defendant) got into a domestic dispute about a purported love affair between Sandra's daughter and Diana's husband.  Andy, Omar, Zavala-Martí and three other members of the conspiracy traveled to Victor Berríos after hearing that Sandra and Diana had shot guns at each other as part of the dispute.  Zavala-Martí warned Sandra and Diana that gunfire compromised the drug point because it would make the drug point "hot" and "attract cops."  He also threatened Sandra that if "he had to go back because of this sort of issue, . . . he was going to deal with her."

Sandra concedes that she did not lodge a contemporaneous objection to the testimony about the homemade knife, the domestic dispute, or the shooting itself at trial.  We therefore review her claims for plain error, which means that we will only deem the testimony's admission to justify reversal if it "seriously affect[ed] the fairness, integrity, or public reputation of

judicial proceedings." United States v. Olano, 507 U.S. 725, 732 (1993) (internal quotation marks omitted); see United States v. Niemi, 579 F.3d 123, 128 (1st Cir. 2009) (reviewing defendant's forfeited 404(b) argument for plain error).

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Rule expressly provides that evidence of prior bad acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).[16]

Andy's account of the domestic dispute between Sandra and Diana exemplifies the type of prior bad act evidence that may be admitted for a purpose other than to show propensity. See Fed. R. Evid. 404(b)(2) ("Permitted Uses"). The story illustrated how

---

[16] Subparagraph (b)(2) of Rule 404 provides: "On request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial[.]" See also United States v. Tuesta-Toro, 29 F.3d 771, 774—75 (1st Cir. 1994) (discussing the specificity with which such a request must be made, and holding that a general request for exculpatory information was insufficient). Sandra argues that the prosecutor improperly failed to provide notice of the evidence, but she also admits that she did not request such notice. We therefore reject any implied argument that the prosecutor's failure to provide proper notice constituted reversible error.

high-ranking co-conspirators reprimanded lower-ranking members and ensured the drug-selling operation's continued success. Thus, while the domestic dispute itself was not relevant to Sandra's guilt, the incident in its entirety was probative in showing Sandra's participation in the conspiracy. <u>See</u> <u>United States</u> v. <u>Currier</u>, 821 F.2d 52, 55 (1st Cir. 1987) ("[E]vidence of prior or contemporaneous uncharged conduct may be admissible to complete the story of a crime by proving the immediate context of events near in time and place."); <u>United States</u> v. <u>Watson</u>, 695 F.3d 159, 165 (1st Cir. 2012) (explaining that "the full weight of [the narrative] would be lost on the jury absent the introduction of some limited factual foundation"); <u>United States</u> v. <u>Guerrero</u>, 169 F.3d 933, 944 (5th Cir. 1999) (noting that Rule 404(b) permits admission of evidence that explains the relationship between the parties).

With respect to the homemade knife incident, the story had no direct connection to Sandra in the first place. Any inference that the jury may have made due to the familial relationship between Lauren and Sandra was too tenuous to attribute the "bad act" to Sandra in these circumstances, especially under plain error review. We therefore need not decide whether the purpose of softening the blow of cross-examination would have been a proper non-propensity purpose under Rule 404(b). Either way, it was at worst harmless.

Having rejected Sandra's evidentiary arguments, we proceed to her sentencing challenges.

## B.    Sentencing Challenges

The district court sentenced Sandra to twenty years' imprisonment with respect to count one, which represented the mandatory minimum term of incarceration for that count due to the drug quantities found by the jury, the proximity of the offense to a public housing project, and Sandra's prior felony drug offense convictions.  See 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), 846, 851, and 860.  She was sentenced to 188 months for each of the four remaining counts, to run concurrently with count one and each other.  Sandra challenges what amounts to a twenty-year sentence on two bases, both of which butt up against a stone wall of controlling precedent.  She also fails to direct us to any indication in the record that she preserved her claims.  We therefore review her two sentencing arguments on plain error review.  See United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010).

Sandra first makes a broad attack on the constitutionality of mandatory minimum sentences.  This Court has already determined that "it is beyond cavil that Congress has the power to set statutory minimum and maximum sentences to which courts must adhere."  United States v. Gonzalez-Ramirez, 561 F.3d 22, 30 (1st Cir. 2009) (citing Chapman v. United States, 500 U.S.

453, 467 (1991)). No subsequent case has called that conclusion into question. Sandra's constitutional challenge to mandatory minimum sentences therefore fails to raise error, much less plain error.

Sandra's second sentencing challenge is based on a conflict she perceives between mandatory minimum sentences and the mandate in 18 U.S.C. § 3553(a) that sentences be "sufficient, but not greater than necessary, to comply with the purposes set forth" therein, including the nature and circumstances of the offense, the history and characteristics of the defendant, and other enumerated sentencing factors. See 18 U.S.C. § 3553(a). She argues that sometimes the mandatory minimum is greater than necessary to comply with those purposes.[17] Thus, she says, we must rely on the rule of lenity to resolve the ambiguity in her favor, and (we assume) remand to the district court for a different sentence.

We need look no farther than the text of section 3553 itself to conclude that no such conflict exists. Sections 3553(e) and (f) describe the limited situations in which a sentencing judge has the authority to impose a sentence below a statutorily mandated minimum. A court may impose a lower sentence, for instance, when the government makes a motion to reduce the sentence due to the defendant's "substantial assistance" with an investigation or

_____

[17] Sandra fails to explain why her own sentence ought to be characterized as such.

-41-

prosecution.  18 U.S.C. § 3553(e).  There would have been no need for Congress to include these carve-outs had it not assumed that statutory mandatory minimums were generally applicable.  Cf. United States v. Jimenez, 507 F.3d 13, 21 (1st Cir. 2007) (stating that the rule of lenity "only applies if there is a grievous ambiguity in the statute" (internal quotation marks omitted)).  Finding no ambiguity, reliance upon the rule of lenity is unnecessary, and we find no plain error in the district court's decision to subject Sandra to the statute's mandatory minimum sentence.

## V.  Sonia Flores-Rivera's Arguments

### A.  Sufficiency of the Evidence

Like Ramos, Sonia moved for a judgment of acquittal based on the insufficiency of the evidence against her at the close of the government's case and post-trial.  See Fed. R. Crim. P. 29(a). Once again, we review the district court's denial of her Rule 29 motion de novo, viewing the evidence in the light most favorable to the jury verdict.  See Appolon, 695 F.3d at 55.

In order to sustain a conviction for the drug conspiracy counts, "the evidence must show that: (1) [the] conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant knowingly and voluntarily participated in the conspiracy."  United States v. Maryea, 704 F.3d 55, 73 (1st Cir.

2013).[18]  Here, the facially plausible trial testimony of Sonia's admitted co-conspirators provided sufficient evidence to sustain her conviction.  See Cortés-Cabán, 691 F.3d at 14.  Sonia was identified by both Delgado and Xiomara as a "runner" for Ramos's organization.  Delgado also testified that he personally saw Sonia tallying drug proceeds at her apartment, and that he saw her take money from another conspirator and "stash" it until another member of the conspiracy retrieved the money.  Based on this testimony, the jury was entitled to conclude that Sonia, too, conspired to further the organization's objectives.

## B.  Prejudicial Variance

Sonia also argues that even if the evidence was sufficient to prove her participation in the organization's drug trafficking at the Victor Berríos housing project, there was insufficient evidence tying her to the "larger conspiracy" charged in the indictment.  She points out that the indictment alleged a conspiracy taking place in Yabucoa, Caguas, and elsewhere in Puerto Rico, but the evidence of her direct participation was localized to Victor Berríos in Yabucoa.[19]

---

[18] Sonia's opening brief did not include any argument on the aiding and abetting counts, and her reply brief simply claims that should the conspiracy convictions fall, so too will the aiding and abetting convictions.  We find her argument as to the aiding and abetting convictions waived.  See United States v. Zannino, 895 F.2d 1, 17 (1990).

[19]  The trial testimony showed that Ramos's employees operated in at least the cities of Aguas Buenas, Caguas, and Yabucoa.

We interpret Sonia's brief to argue that there was a prejudicial variance between the indictment and the trial evidence against her. She groups this claim together with her sufficiency of the evidence argument, but she failed to alert the district court that she was claiming a distinct prejudicial variance error. Since we have previously stated that a prejudicial variance claim is often "a challenge to the sufficiency of the evidence," see United States v. Martínez-Medina, 279 F.3d 105, 113 (1st Cir. 2002), we give Sonia the benefit of the doubt and assume without deciding that she preserved this argument by making her Rule 29 motions below, because here the standard of review does not change the outcome. Cf. United States v. Lyons, 740 F.3d 702, 716 (1st Cir. 2014). Our review is therefore de novo, taking all of the evidence in the light most favorable to the government. See Maryea, 704 F.3d at 73; Martínez-Medina, 279 F.3d at 113.

"A prejudicial variance occurs when (1) the facts proved at trial differ from those alleged in the indictment; and (2) the error affects the defendant's substantive rights." Maryea, 704 F.3d at 73. Sonia is unable to satisfy either prong of our inquiry.

With regard to the first prong, in order to be convicted of participating in a conspiracy, "each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in

furtherance of it." Martínez-Medina, 279 F.3d at 113. Furthermore, "[t]he jury may infer an agreement circumstantially by evidence of, inter alia, a common purpose (such as a purpose to sell illicit drugs), overlap of participants, and interdependence of various elements in the overall plan." Id. at 113–14.

The evidence before the jury showed not only that the drugs flowed from Ramos's inventory to multiple housing projects in different cities, but that Ramos's lieutenants enforced organizational discipline, punished thieves, and sought to exclude competitors at Ramos's various drug points. Runners and lieutenants traveling from Caguas to Victor Berríos did not merely deliver drugs, but also checked on supply at each point of sale. Moreover, at least one witness--Andy--testified that he worked at multiple drug points owned by Ramos during his employment for the organization. See Rodriquez, 525 F.3d at 103 (fact that different drug point owners used the same runners and sellers was evidence of a single conspiracy); cf. Martínez-Medina, 279 F.3d at 114 ("In a case where a common supplier is the sole link between diverse distributors, it may be more difficult to sustain a finding of common agreement, although even then one could be inferred by additional evidence--e.g., a finding that the various distributors depended on one another for the health of their own drug business." (internal citations omitted)).

Sonia also offers no coherent explanation for why she sustained any prejudice (prong two) due to her claimed lack of involvement in the organization's activities outside of the Victor Berríos drug point. Simply put, the jury easily could have convicted her for having the precise role charged in the indictment--running drugs and serving as an accountant for drug sales--without any consideration of events at other locations. See United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995) ("[S]o long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged--so long as the difference does not cause unfair prejudice."). Sonia does not, for example, contend that some of the drug types in the indictment related only to trafficking by others that occurred outside of Victor Berríos, or that sales made outside of that housing project were needed to achieve the charged quantity thresholds. Cf. United States v. Dellosantos, 649 F.3d 109, 124 (1st Cir. 2011) (evidence failed to show that defendants participated in a conspiracy to sell marijuana and cocaine, as opposed to solely cocaine). Nor could she, since, as discussed in Part I, supra, the vast majority of the evidence presented at trial--including evidence of all four types of drugs--related to the organization's activities at Victor Berríos. Absent any showing of prejudice, we are unable to assign plain error to the alleged variance.

## C.    Prejudicial Evidence

Sonia next argues that the district court erred by admitting testimony that should have been excluded under Federal Rule of Evidence 403.  That rule provides:  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403. Since her trial counsel failed to raise an objection to any of the testimony she now claims was wrongfully admitted under this Rule, she must show that the district court's failure to exclude such evidence amounted to plain error.  See Rodriguez, 525 F.3d at 98 (assessing newly-unveiled Rule 403 claim for plain error).  This she cannot do.

### 1.    Delgado's Shooting

On direct examination, Delgado began testifying about a shooting he attempted to carry out against another co-conspirator when Delgado was still working for the Nazario brothers.  The district court interrupted the testimony and then stated in open court that it saw "no relationship to this case."  Counsel requested no mistrial, nor was this remotely cause for a mistrial. In short, there was no error, much less plain error.

### 2. Ramos's Threat to "Spill Blood"

Andy testified about a threat Ramos made to "spill" the blood of a competitor at a drug point in Aguas Buenas if the competitor did not cease selling drugs there.[20] Sonia makes a one-sentence argument that this testimony "was clearly more prejudicial than relevant, and unfairly distracted the jury from whether Appellant agreed to join a conspiracy with Ramos' enterprises in Caguas and Aguas Buenas, to how dangerous its members were." She therefore appears to premise her argument on her belief that the organization's activities outside of Yabucoa constituted a separate conspiracy, and were thus irrelevant to her. That premise is faulty, since, as we explained in addressing her prejudicial variance argument, the trial testimony from Andy showed evidence of interdependence and a common supply chain between the organization's various drug points. Ramos's attempts to maintain control over his drug points, rather than being a distraction, were certainly relevant to proving the conspiracy's existence. The fact that Sonia did not directly participate in this event does not--taken alone--deem the evidence unduly prejudicial with respect to

---

[20] Ramos's counsel objected to this testimony, but Sonia's did not join in the objection. We decline to deem the argument preserved for Sonia, particularly because the evidence pertained to Ramos, and the district court did not have an opportunity to evaluate its admissibility with regard to Sonia. Her argument is therefore forfeited and reviewed only for plain error. See United States v. Acosta-Colón, 741 F.3d 179, 189 (1st Cir. 2013) (rejecting an undeveloped argument that co-defendants may "piggyback" on one another's objections).

her conviction.  Cf. Maryea, 704 F.3d at 73 (explaining, in responding to a prejudicial variance argument, that while "knowledge of the broader conspiracy's existence is critical," the "government need not prove that the defendant had knowledge of every other participant, or of the details of the conspiracy"). Further, any potential prejudice against Sonia was diminished by the fact that Ramos never carried out the threat, and the incident did not involve her.

### 3.    Shootout Between Sandra and Diana Flores-Rivera

We have already described Andy's testimony related to Sandra and Diana's domestic dispute.  Sonia also challenges this evidence, but on Rule 403 rather Rule 404(b) grounds.  Her claim of undue prejudice with respect to the domestic dispute evidence is even weaker than Sandra's 404(b) argument, because Sonia was not involved in the alleged shooting at all.  Sonia attempts to bridge this gap by claiming the story constituted evidence of guilt by association that "served to suggest that because [Sonia] was a member of this family, she must also be guilty."  But given the evidence's obvious probative value in illustrating the organization's disciplinary system, in addition to her failure to object below, this is a bridge too far.

Having rejected each of her Rule 403-based arguments, we proceed to Sonia's next category of claimed evidentiary errors.

## D.   Testimony Based on "Speculation"

On direct examination, Xiomara testified that the notation "M.I." in one of the drug ledgers written by co-conspirator Sandra Fernandez-Espinosa[21] could have referred to either "Mimi" (Sonia's nickname) or another co-conspirator, "Miguelito."  Sonia claims on appeal that this testimony was admitted in violation of Federal Rule of Evidence 602 because Xiomara lacked sufficient personal knowledge to connect the ledger notation to Sonia.  Rule 602 provides: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."

We have previously stated that under Rule 602, testimony is inadmissible "only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed what he testified to."  United States v. Brown, 669 F.3d 10, 22 (1st Cir. 2012).  "Personal knowledge can include inferences and opinions, so long as they are grounded in personal observations and experiences."  United States v. Rodriguez, 162 F.3d 135, 144 (1st Cir. 1998) (internal quotation marks omitted).

---

[21] The ledgers were seized by the agents and had previously been admitted into evidence without objection.

As a threshold matter, Sonia and the government dispute whether Sonia's trial counsel made a contemporaneous objection to this testimony at trial.  We need not definitively decide whether her claim of error is preserved because, even under the less deferential standard of review for preserved claims of error, Sonia fails to show that the admission of the ledger testimony constituted reversible error.

Simply put, the jury was entitled to hear Xiomara's testimony and afford it the proper amount of weight.  Xiomara testified that she personally tallied the drugs with Fernandez-Espinosa, and that she watched Fernandez-Espinosa make recordings in the ledger.  Given Xiomara's role in the conspiracy, and her testimony that Sonia acted as a runner, Xiomara could have fairly inferred that the notation referred to one of the two co-conspirators she named.  See Rodriquez, 162 F.3d at 144.  Moreover, considering Xiomara, Delgado, and Andy's other testimony about Sonia's involvement, any error caused by the introduction of the evidence was harmless.  See United States v. Muñoz-Franco, 487 F.3d 25, 63 (1st Cir. 2007) (internal quotation marks omitted).

Sonia makes a similar Rule 602 argument, this one indisputably raised for the first time on appeal, about Xiomara's testimony that she saw Sonia carrying bags containing drugs while acting as a runner for the organization.  We find no plain error in the district court's decision to admit this unobjected-to

testimony.  Xiomara's belief that the bags contained drugs were based on what "everybody knew."  Absent an objection, the district court lacked an opportunity to determine whether Xiomara meant that co-conspirators had told her what was in the bags, in which case the evidence may have been admissible under the co-conspirator hearsay exception, see Fed. R. Evid. 801(d)(2)(E),[22] or whether her statement was based on unsupported speculation.  We thus decline the invitation to disturb the district court's judgment based on the cold appellate record.  Cf. United States v. Houlihan, 92 F.3d 1271, 1297 (1st Cir. 1996).

Finally, Sonia makes a two-sentence argument that Delgado lacked personal knowledge to testify that Sonia stored the organization's drug trafficking proceeds.  She claims that the testimony was based on inadmissible hearsay--statements by co-conspirator Zavala-Martí--but her argument is based upon a misreading of the trial transcript.  When asked how he knew that the drug money was given to Sonia, Delgado testified that he "saw her."  There was no contemporaneous objection to this testimony at trial.  Of course, personally viewing Sonia procure the money was

---

[22] Rule 801(d)(2)(E) provides that a statement offered against a party that is made by that party's co-conspirator during and in furtherance of the conspiracy is not hearsay.

a sufficient basis for Delgado to conclude that Sonia served in that role.[23]

## E.    Jury Instructions

Sonia claims in a parenthetical of her opening brief that the district court's failure to instruct the jury "that it must determine the guilt of each defendant on each count separately" amounted to a "distinct and serious plain error."  There was no objection to this instruction at trial.  We decline to construct Sonia's arguments for her, and we thus deem this assignment of error waived.  See United States v. Sevilla-Oyola, 770 F.3d 1, 13—14 (1st Cir. 2014) (explaining that "[a]rguments raised in only a perfunctory and undeveloped manner are deemed waived on appeal").

---

[23]    After Delgado stated how he knew Sonia stored the funds, he was asked by the prosecutor how he knew "where the money ended up after leaving [Sonia's] hands."  Ramos's trial counsel lodged an objection at this point ("Objection, if he doesn't know"), but Sonia's did not.  Delgado then explained the basis for his personal knowledge:  Zavala-Martí, an undisputed leader of the organization, told Delgado that Diana Flores-Rivera picked up the money from Sonia and delivered it to Zavala-Martí.  Zavala-Martí's statements themselves--made by a conspirator for the purpose of informing another conspirator what happened to the money--may have been admissible under the co-conspirator hearsay exception.  See Fed. R. Evid. 801(d)(2)(E).   The application of the co-conspirator exception is complicated by Delgado's testimony that Zavala-Martí told him this information because, in Delgado's words, "I worked with the organization and we told each other, I mean, like as friends."  So, arguably, Zavala-Martí did not tell Delgado the information "in furtherance" of the conspiracy itself, as would be required by that exception.  In any event, there was no objection to Zavala-Martí's second-hand remarks, and we find no plain error in the district court allowing the jury to find out what happened to the money after Sonia took it.

## F.  Read-backs in the Jury Room

During its deliberation, the jury sent a note to the trial judge that read, in relevant part: "We would like to hear the transcripts from Harry's and Xiomara's testimony that make reference to Sonia Flores (Mimi)."  The judge, while in chambers with the prosecutor, defense counsel, and the court reporter, instructed the court reporter to read both the direct and cross-examination for those two witnesses.  The judge also explained the restricted nature of the read-back procedure:  "You are there as a stone," the judge told the court reporter.  The court reporter could read the transcripts, and repeat anything the jury requested to be repeated.  However, the jury was not permitted to ask the court reporter any other questions, nor was it allowed to make any comments in the court reporter's presence.

The judge then asked the attorneys, "Do you want me to bring them out in court?"  Ramos and Sonia's attorneys responded that "we prefer in open court."  So the judge summoned the jury into the courtroom, reiterated the instructions and the limited nature of the read-back procedure, and confirmed that the jurors understood the applicable restrictions.  The jury foreperson expressed a preference to do the read-back in the jury room, which the judge said was "[f]ine.  That's your choice."  None of the attorneys objected.

On appeal, Sonia claims that the court reporter's read-backs in the jury room violated her rights to a public trial, to be present for all parts of the trial, and to the assistance of counsel. She also claims that the read-back procedure violated Federal Rule of Criminal Procedure 43 (the "Court Reporter's Act"), which requires the defendant to be present "at every trial stage."

We note at the outset that the trial transcript does not evince any contemporaneous objection to the district court's grant of permission for the jury to retire to the jury room during the read-backs. This finding disposes of Sonia's Rule 43 claim, as we have refused to entertain similar Rule 43 arguments on appeal where trial counsel had a clear opportunity to object, but did not. See United States v. Fernández-Hernández, 652 F.3d 56, 66 (1st Cir. 2011) ("[E]ven assuming [the defendant] had a statutory right to be present under Rule 43 in these circumstances[,] . . . he waived that right by remaining silent.") (citing United States v. Gagnon, 470 U.S. 522, 529 (1985)).

As for her constitutional claims, we find no plain error in the way the district court handled the read-backs. We rest this finding primarily on the second prong of the plain error test (requiring the error to be "clear and obvious"), see Rios-Hernández, 645 F.3d 456, 462—63 (1st Cir. 2011), because our circuit has yet to establish any bright-line rules on read-back procedures. For example, in United States v. Luciano-Mosquera, 63

-55-

F.3d 1142, 1156–57 (1st Cir. 1995), we addressed a situation where a trial judge sent a court reporter to conduct a read-back in the jury room without doling out any cautionary instructions. Since defense counsel did not object, and since "[t]here [was] no evidence that anything untoward happened in the jury room and no reason to think the reporter did anything other than properly read the pertinent portions of the record," we declined to reverse the defendant's convictions. Id. at 1157. Here, the district court provided explicit cautionary instructions in open court, and from our reading of the record, defense counsel appeared to accede to the procedure as it unfolded. While it may well have been preferable for the district court, in an abundance of caution, to conduct the read-backs in the presence of the defendants and their attorneys, we find no plain error in its decision.

G. **Delgado's Testimony About Meeting Ramos in Bayamón 308**

Prior to trial, the government disclosed to the court and the defendants that it could not verify from the available prison records that Delgado and Ramos were simultaneously incarcerated at the "Bayamón 308" prison in 1998, even though Delgado told the grand jury that the two first met there that year. The government then informed the court and the defendants that it would not be

presenting any evidence about their alleged meeting on direct examination.[24]

Nevertheless, on Delgado's cross-examination, Ramos's counsel chose to elicit Delgado's story about meeting Ramos at Bayamón 308 in an apparent attempt to impeach Delgado by reference to the earlier grand jury testimony. Delgado then claimed that he spoke to someone claiming to be named "Robert Belleza" (Ramos's alias) through windows and pipes at Bayamón 308, although he denied ever seeing Ramos there face-to-face. There was no objection by the defense, which intended to bring out the testimony all along.[25] When it came time for the defense to present its own evidence, Ramos's counsel introduced a prison administrator to testify as to the prison records' failure to show any overlap between Ramos and Delgado's incarceration at Bayamón 308 in 1998, although the records did show that both were imprisoned there close in time to one another. On cross-examination of the administrator, the prosecutor tried to show that the records were unreliable.

---

[24] This exchange is not in the record, but it is referred to in the trial transcript.

[25] Omar's counsel stated during his opening statement that "[Delgado] told the grand jury that he met [Ramos] while he was in prison in 1998." At that point, the prosecutor requested a sidebar to express her concern that Omar's counsel was inviting a mistrial by telling the jury that Ramos had previously been incarcerated. The district court replied that it was "sure that counsel has gotten all ready for this trial," and declined to take any further action. Omar's counsel proceeded with his opening, stating that Delgado lied to the grand jury about meeting Ramos at Bayamón 308.

The next day, Sonia's counsel filed a written "Motion to Order the Government to Fulfill its Obligation Under Napue." Her motion argued that by failing to correct Delgado's testimony about Bayamón 308, the prosecution had "knowingly use[d] false . . . testimony" in violation of Napue v. Illinois, 360 U.S. 264, 269 (1959). Counsel orally raised the motion the next day, and requested a mistrial, which the district court denied. We thus treat her Napue argument as properly preserved for appeal, and our review of the district court's denial to retry the case is for manifest abuse of discretion. See González-González, 258 F.3d at 22.

Under Napue, a prosecutor "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction regardless of whether the prosecutor solicits false evidence or . . . allows false evidence to go uncorrected when it appears." United States v. Mangual-Garcia, 505 F.3d 1, 10 (1st Cir. 2007) (quoting Napue, 360 U.S. at 269) (internal quotation marks and alterations omitted). However, "[w]hen the defendant knows about the false testimony and fails to bring it to the jury or the court's attention, the assumption is that he did so for strategic reasons, and the defendant will not be able to question his own strategic choices on appeal." Id. at 10—11.

We reject Sonia's Napue argument for two principal reasons.

First, it is a stretch to say that Delgado's testimony about meeting Ramos at Bayamón was "knowingly . . . false" to the prosecutor. Delgado testified that he spoke through windows and pipes to someone who called himself by Ramos's alias, and that he thought the person was Ramos, but that he did not see the speaker's face. The prosecutor's decision not to elicit the testimony at trial was based on her discovery that the story was uncorroborated by available prison records. That lands short of an admission by the prosecutor that she knew Delgado was lying. Under these circumstances--especially where the prosecutor brought the inconsistency to the attention of the court and defense counsel prior to trial--the prosecutor's decision not to "correct" the testimony when it was thereafter elicited by the defense was not improper.

Second, the testimony only came before the jury for the defense's own "strategic reasons." Manqual-Garcia, 505 F.3d at 10. Just as a defendant's strategic failure to object to false testimony will not create a Napue violation, neither will a defendant's strategic elicitation of such testimony. Cf. id. at 10—11 & n.7 (collecting cases for the proposition that the tactical omission of an objection does not give rise to a Napue claim). This is especially true when, as here, defense counsel came prepared to impeach said testimony.

## H.    Sentencing Challenges

Sonia makes what we interpret to be two categories of challenges relating to her 151-month sentence.

### 1.    Firearm Enhancement

Despite the prosecutor's decision to dismiss the firearms count against Sonia, the district court imposed a two-level firearm enhancement under U.S.S.G. § 2D1.1(b)(1), which contributed to Sonia's total offense level of 34.[26]  Sonia levied an objection to the enhancement in her sentencing memorandum, renewed the objection at her sentencing hearing, and assigns error to the enhancement's application once again on appeal.  Arguments such as Sonia's--that the district court wrongly applied the facts of the case in imposing a guidelines enhancement--are subject to clear error review.  See United States v. Thongsophaporn, 503 F.3d 51, 57—58 (1st Cir. 2007).[27]

Section 2D1.1(b)(1)'s firearm enhancement "applies whenever a codefendant's possession of a firearm in furtherance of their joint criminal venture [is] reasonably foreseeable" by the

---

[26] Sonia's 151-month sentence sat at the bottom of the guidelines range for that offense level.

[27] The heading to this section of Sonia's brief states that her sentence was procedurally and substantively unreasonable, but she makes no argument to this effect.  We therefore deem any challenge to her sentence's procedural and substantive reasonableness waived, aside from her argument regarding the firearm enhancement.  See United States v. Rossignol, 780 F.3d 475, 477 & n.2 (1st Cir. 2015).

defendant.  United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991).[28]  Even though there was no direct evidence at trial or in the presentence investigation report evidencing Sonia's awareness of the use of firearms in connection with the conspiracy, our circuit's case law on point piles a mountain too high for her to climb.  Indeed, "[b]ecause firearms are considered common tools of the drug trade," where firearms are used in furtherance of drug offenses, the two-level "enhancement should be applied if [a] weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  Thongsophaporn, 503 F.3d at 58 (internal quotation marks omitted).

Here, the trial testimony showed that Sonia was a runner of crack, cocaine, and marijuana, and that she helped stash all four types of drugs sold by the organization.  She had contact with several other co-conspirators, including Delgado, who had a reputation for shooting his gun.[29]  Finding, as we do, that the use of firearms during and in furtherance of the conspiracy was not "clearly improbable" from Sonia's perspective, we see no clear error in the district court's choice to apply the enhancement.

---

[28] U.S.S.G. § 1B1.3(a)(1)(B) requires the sentencing court to consider "in the case of a jointly undertaken criminal activity . . ., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."

[29] Delgado had a reputation for donning a bulletproof vest and frequently firing guns while at the housing project. He testified that he was armed "all the time."

## 2.  Fair Sentencing Act Amendments

Sonia next argues that she is entitled to resentencing under the Fair Sentencing Act of 2010 ("FSA"), which was passed five months after the district court imposed her sentence.  Our circuit has already decided that the FSA does not apply retroactively to those who, like Sonia, were sentenced before the FSA's enactment.  See United States  v. Goncalves, 642 F.3d 245, 253—54 (1st Cir.), cert. denied, 132 S. Ct. 596 (2011).  Her argument thus necessarily fails.[30]

Anticipating our disagreement with her retroactivity argument, Sonia asks us to "address the issue raised here to guide the District Court in the exercise of its discretion pursuant to 18 U.S.C. § 3582(c)(2)."  Section 3582(c)(2) provides that "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . ., the court may reduce the term of imprisonment."  (Emphasis supplied).  The statute, by its plain language, is triggered in the first instance by the discretion of the sentencing judge, not the Court of Appeals.  Sonia does not point to any evidence that she brought this request to the district court in the intervening years between the

---

[30] Sonia also seems to argue that the imposition of her pre-FSA sentence violated the Equal Protection and Due Process clauses of the constitution.  We deem her glancing references to those constitutional provisions as waiving any viable challenge to her sentence for which they form a basis.

imposition of her sentence and this appeal.  Therefore, we reject Sonia's invocation of section 3582(c), without opining on her eligibility for a sentence reduction.

## VI.  Conclusion

To summarize, appellants Carlos Omar Bermúdez-Torres and Cruz Roberto Ramos-González are entitled to a new trial on all six counts of their conviction, plus the forfeiture count.  We <u>remand</u> their cases to the district court for a new trial.  Having rejected each of Sandra and Sonia Flores-Rivera's challenges, we <u>affirm</u> their respective convictions and sentences.

<u>So ordered</u>.