# United States Court of Appeals
## For the First Circuit

No. 16-1104

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY SPENCER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Kayatta, and Barron,
Circuit Judges.

Karen A. Pickett, with whom Pickett Law Offices, P.C. was on brief, for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom William D. Weinreb, Acting United States Attorney, was on brief, for appellee.

August 23, 2017

**BARRON**, **Circuit Judge**.  Barry Spencer was convicted in federal court of one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2, and one count of conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846.  He now appeals the District Court's denial of his motion for a new trial, which relied primarily on the government's alleged violation of Brady v. Maryland, 373 U.S. 83 (1963).  Spencer also challenges on appeal the admission at trial of certain testimony from two police officers concerning Spencer's conduct during (and immediately preceding) the undercover drug purchase that led to the charges against Spencer, certain statements made by the prosecutor during closing argument, and the decision by the Magistrate Judge assigned to Spencer's case to deny discovery on Spencer's claim of vindictive prosecution.  Finding no merit to these challenges, we affirm.

## I.

We first recount key aspects of the record developed at Spencer's trial (which followed an earlier mistrial) and at two post-trial hearings before the District Court.  We recount, too, the procedural history of the case.  Because a number of the issues that Spencer raises on appeal are quite fact-dependent, we focus up front on only those facts that pertain to his conviction on the two drug counts.  We thus reserve a full discussion of the facts

relevant to the specific challenges that Spencer raises on appeal for our consideration of the merits of the challenges. We do, however, provide sufficient detail regarding the procedural history to isolate the particular issue on which his primary challenge -- concerning the alleged Brady violation -- hinges.

**A.**

According to testimony at trial, on March 20, 2013, two members of the Boston Police Department ("BPD") -- Detective Sergeant Donald Keenan and Officer Richard Casallas -- identified Spencer as someone who was potentially selling drugs in the Egleston Square area of Roxbury, one of Boston's neighborhoods. According to Keenan's trial testimony, Keenan was familiar with Spencer "from the neighborhood" and made the decision to deploy Casallas, who was working undercover, to make a drug purchase. Casallas then approached Spencer and asked if Spencer was "on." Spencer responded that he was "always on," and Casallas then asked Spencer if he could purchase $20 of crack cocaine. Spencer told Casallas to follow him, and the two men briefly walked down the street together. Spencer then told Casallas to return to the bus stop where they had started.

Several minutes later, according to testimony at trial, Spencer came back with Michael Morrison. Casallas testified that, with Spencer "scanning the area, looking at car[s] as they drove by," Morrison sold Casallas a small bag of crack cocaine in

exchange for $20. Casallas and Spencer and Morrison then went their separate ways.

Spencer was arrested several days later, on May 26, 2013, in connection with the undercover purchase of the crack cocaine.[1] Thereafter, the case was transferred to federal authorities for prosecution, and, on June 26, 2013, Spencer was indicted by a federal grand jury and charged with one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2. In a superseding indictment filed on August 28, 2013, the government also charged Spencer with one count of conspiring -- with Morrison -- to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. On March 26, 2014, the government filed a second superseding indictment that specified that the controlled substance was cocaine base, not cocaine.

Spencer's first trial on these charges ended in a mistrial. As the District Court later explained, one of the jurors then sent an "unsolicited letter to the court" expressing the sentiment that "the total case . . . seemed unfair[,] [u]njust[, and] [w]rong." Spencer was, however, retried on the same charges. And, after a three-day trial, Spencer was found guilty on both counts of the second superseding indictment and

---

[1] Morrison was initially charged together with Spencer, but Morrison pleaded guilty to the three counts against him in the first superseding indictment. The second superseding indictment thus charged Spencer alone.

sentenced to 60 months' imprisonment and 36 months' supervised release.

**B.**

On May 14, 2015, several weeks after Spencer had been convicted of these charges, he filed, pro se, what he styled as a "Renewed Motion for a Required Finding of Not Guilty or, in the Alternative, for a New Trial." That motion claimed, among other things, a Brady violation. Specifically, Spencer contended that the government had, in violation of Brady, failed to turn over evidence regarding the prosecution's involvement in triggering a correction to certain erroneous information set forth on a certificate that had been issued by the chemist for the Massachusetts State Police Laboratory (the "State Police Laboratory") who was responsible for analyzing the chemical composition of a sample of the substance that the government alleged Casallas had purchased from Morrison.

The District Court denied Spencer's motion for a new trial on October 8, 2015. In doing so, the District Court explained that, based on United States v. Del-Valle, 566 F.3d 31, 38 (1st Cir. 2009):

> [i]n the normal course, a defendant who seeks a new trial on the basis of newly discovered evidence must establish that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material and not merely cumulative or impeaching; and (4) the emergence of the

evidence will probably result in an acquittal upon retrial of the defendant.

However, because the basis for Spencer's motion was "that the government failed to disclose evidence required to be disclosed" under Brady, the District Court -- quoting United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001) -- explained that a "more defendant-friendly . . . standard applies." Specifically, the District Court noted that, as we held in United States v. Flores-Rivera, 787 F.3d 1, 15-16 (1st Cir. 2015), with respect to what a defendant must show when seeking a new trial based on violation of Brady, "[i]nstead of requiring that the defendant show that an acquittal would have 'probably' resulted had the material been produced, we require only that the defendant show a 'reasonable probability' that had the government disclosed the evidence prior to trial, the result of the proceeding would have been different."

The District Court then applied this more "defendant-friendly" test, under which Spencer's "threshold" burden was to show that a Brady violation did, in fact, occur. Accordingly, the District Court used the three-prong test outlined by the Supreme Court in Strickler v. Greene, 527 U.S. 263, 281-82 (1999), for determining whether a Brady violation occurred. As the District Court explained, under Strickler, "[t]here are three components of a true Brady violation: [1] [t]he evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Id. And, the District Court further explained, relying on Kyles v. Whitley, 514 U.S. 419, 434 (1995), that, in order to show prejudice under Brady, the defendant must demonstrate that the undisclosed evidence is material -- that is, the defendant must show that there would be a "reasonable probability of a different result" at trial had the evidence been disclosed.

The District Court concluded that, with respect to the evidence concerning the prosecution's contacts with the chemist for the State Police Laboratory that had not been disclosed by the government, Spencer had succeeded in meeting his burden as to the first two prongs of the test for finding a Brady violation set forth in Strickler. The District Court concluded, however, that, "by the narrowest of margins," Spencer had not shown that he was prejudiced by the government's withholding of the evidence -- that is, that he had not shown that it was reasonably probable that the outcome at trial would have been different had the evidence been disclosed. Accordingly, the District Court ruled that there had been no Brady violation. And, because the District Court concluded that Spencer's motion -- although it also referenced other issues -- "focused on the government's failure to disclose"

evidence regarding the prosecution's communications with the chemist for the State Police Laboratory, the District Court denied the motion.

Spencer then filed this timely appeal, in which he challenges four separate rulings below: first, the District Court's denial of his motion for a new trial under Brady on the ground that the undisclosed evidence was not material; second, the admission at trial of certain testimony from the two police officers who organized and participated in the undercover drug purchase that led to Spencer's arrest; third, the District Court's refusal to declare a mistrial in consequence of certain statements made by the prosecution during closing argument; and, finally, the decision to deny Spencer discovery on his motion to dismiss the case against him based on an allegation of vindictive prosecution. We consider each challenge in turn.

## II.

We start with Spencer's challenge to the District Court's ruling denying the motion for a new trial based on the claimed Brady violation. Spencer challenges only the third step of the District Court's Brady analysis, concerning the materiality of the undisclosed evidence, and thus we, too, focus on that issue. For the reasons that follow, we reject Spencer's contention that the District Court reversibly erred in denying Spencer's Brady-based motion.

**A.**

We have explained that, "[i]n Brady, the Supreme Court held the Government's suppression of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005) (citing Brady, 373 U.S. at 87). This materiality prong of the Brady inquiry requires that the defendant show that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Turner v. United States, 137 S. Ct. 1885, 1893 (2017) (quoting Cone v. Bell, 556 U.S. 449, 469-70 (2009)).

As the Supreme Court emphasized in Strickler with respect to materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 527 U.S. at 264 (quoting Kyles, 514 U.S. at 434); see also Turner, 137 S. Ct. at 1893 ("A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." (citations omitted)). On the basis of this precedent, we have explained that "[t]his somewhat delphic 'undermine confidence' formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an

acquittal." Flores-Rivera, 787 F.3d at 16 (quoting Conley, 415 F.3d at 188).

We review the District Court's denial of Spencer's motion for a new trial on the basis of the government's alleged Brady violation for abuse of discretion. United States v. Cruz-Feliciano, 786 F.3d 78, 87 (1st Cir. 2015). Because, as we have explained, the key issue concerns the materiality, under Brady, of the undisclosed evidence, we are mindful in undertaking this review that "the district court's determination on the materiality of newly discovered evidence in prosecutorial nondisclosure cases is ordinarily accorded deference," United States v. Sanchez, 917 F.2d 607, 618 (1st Cir. 1990) (citations omitted), "[d]ue to its inherently fact-bound nature," id. (citation omitted); see also United States v. Imbruglia, 617 F.2d 1, 7 (1st Cir. 1980) (noting that the "district judge, who presided at appellant's trial, reviewed appellant's newly discovered evidence and concluded it did not justify the granting of a new trial" and concluding that "[h]is assessment deserves regard").

## B.

To assess the merits of the District Court's Brady ruling as to materiality, we first need to set forth in more detail exactly what the District Court determined the undisclosed evidence was and how the government's nondisclosure of that evidence came to light. And so we now turn to that task.

- 10 -

At trial, Spencer's attorney sought to draw the jury's attention to the fact that the government had produced two different "certificates of drug analysis" that were prepared and signed by Claire Rimkus, the chemist at the State Police Laboratory who was responsible for analyzing the sample from the substance that Casallas allegedly had purchased from Morrison. Both certificates were ultimately admitted into evidence.

Each certificate stated that the sample "was found to contain Cocaine . . . present in the base form." Moreover, each certificate identified the same "agency case number" (often referred to as a "cc" or "control" number) that had been assigned to the sample by the BPD. That control number was 130164540.

Officer Sean Flaherty -- the BPD officer responsible for processing the substance alleged to be the cocaine base that Casallas purchased from Morrison -- explained at trial that this control number was generated by the BPD's "Computer Aided Dispatch system" on March 20, 2013, once Flaherty had received the sample from Keenan, and before Flaherty had completed the necessary intake forms and placed the sample in a heat-sealed bag. Flaherty also explained at trial that the purpose of assigning this control number was to ensure that "every piece of evidence . . . is tracked."

The problem was that the first certificate of drug analysis that Rimkus prepared, dated September 26, 2013, indicated

that the "date of incident" associated with the sample was May 26, 2013. That latter date was the date of Spencer's arrest. It was not the date of the alleged transaction between Casallas, the undercover officer, and Morrison, the co-defendant. The second certificate was dated April 4, 2014. That certificate indicated that the "date of incident" associated with the sample was March 20, 2013. That date was the date of the alleged transaction.

In light of the fact that there were two certificates, and that only the latter one correctly stated the date of the alleged incident, Spencer's counsel asked Rimkus, on cross-examination, about the discrepancy. Rimkus responded that, after she had prepared the first certificate, "it was discovered that the Boston Police had essentially given [her] the wrong date of the incident when they submitted the evidence." Rimkus explained that she did not know the reason that the BPD had given her the wrong date originally. Rather, she explained, she "simply receive[d] a drug evidence submission form [sometimes referred to as an "SP-295" form] with suspect name, incident date, incident number, and that is the information that [she] put on [her] report." Rimkus further testified that, with the new information in hand, "[she] then prepared a corrected report," with "[t]he only difference . . . being a different date of incident." Accordingly, Rimkus testified that she prepared a second

- 12 -

certificate, dated April 4, 2014, which indicated that the correct "date of incident" associated with the sample was March 20, 2013.

On the basis of the fact that there were two certificates setting forth different dates of incident, defense counsel contended in the closing argument to the jury that the government had conducted a "sloppy investigation" and asserted that there were "a whole host of reasons why you should not be persuaded beyond a reasonable doubt that Barry Spencer is guilty of being a dope dealer." After the case had been submitted to the jury, the jury requested a "signed/notarized" copy of the April 4 certificate. "[N]o such copy was admitted into evidence," although the jury did have a copy of both certificates, just not a "notarized copy of the corrected version." The jury then convicted Spencer.

Approximately two weeks later, on May 4, 2015, Spencer filed, pro se, his motion for a new trial in which he raised the Brady claim. In that motion, Spencer asserted -- presumably on the basis of Rimkus's testimony that "it was discovered that Boston Police had essentially given [her] the wrong date of incident" -- that Rimkus "testified" at trial that she had "received a call and was told to change the date [of incident]" on the certificate. Spencer further asserted that the government, in violation of Brady, had failed to disclose evidence that "could [have] been

used to impeach . . . the caller who told Claire Rimkus to change the date on the sample."

On May 19, 2015, the District Court held a hearing on that motion and on Spencer's separate motion to appear pro se at that hearing and during sentencing. At the hearing, Spencer (appearing pro se) again asserted that the government, in violation of Brady, had not turned over evidence concerning a phone call that Spencer alleged had been made to Rimkus instructing her to change the date of incident on the lab certificate.

In response to that assertion by Spencer, the Assistant United States Attorney ("AUSA") in charge of Spencer's prosecution, John Wortmann, revealed that, in fact, he had telephoned Rimkus on April 3, 2014, to inform her about the error in the first certificate with respect to the date of incident. Wortmann explained that Rimkus had no knowledge of the actual date of incident and that Rimkus had simply relied on the BPD to supply that information. Specifically, Wortmann stated that "[t]he lab doesn't know where the drugs -- what date the drugs [were] purchased. They can't possibly know that. And the clerical error was committed when the drugs were submitted [by the BPD] to the lab." As a result, Wortmann stated that he had simply contacted Rimkus to correct a "clerical error" on the drug certificate "because the drug lab would have no basis for knowing one way or

- 14 -

the other."  Wortmann suggested that he had also sent a follow-up e-mail to the BPD after the phone call with Rimkus.

The District Court deemed the government's failure to disclose its "involvement in revising a key exhibit" "troubling." On June 4, 2015, the District Court sua sponte ordered an evidentiary hearing.  Two weeks later, the government produced a "Case Conversation Log Report" that had not previously been produced to Spencer in which, as the District Court highlighted, "State Drug Lab employees, including Ms. Rimkus, recorded many . . . of their conversations with the police and prosecutors."

The evidentiary hearing took place on July 2, 2015. During that hearing, Rimkus provided additional testimony.  This testimony, the District Court found, "corroborat[ed]" the government's account of the contact between Wortmann and Rimkus, in which Wortmann telephoned Rimkus to correct the incorrect date of incident set forth on her initial certificate.  The District Court also noted that Rimkus testified that, after speaking with Wortmann, Rimkus called the BPD's evidence unit to confirm the incident date.

Approximately a week after the July 2 evidentiary hearing, on July 10, 2015, the District Court ordered the government to produce the follow-up e-mail to the BPD that Wortmann had testified at the May 19 hearing that he had sent to Rimkus. The District Court ultimately found that, "[a]fter a thorough

- 15 -

search of the AUSA's e-mails, the government concluded that he misspoke and no such email exchange occurred."

## c.

On the basis of the record that had been developed, the District Court denied Spencer's Brady-based motion for a new trial. The District Court identified two distinct types of evidence that the government had failed to disclose -- (1) the State Police Laboratory call log, and (2) other evidence, including the AUSA's own testimony, concerning his "communications with Ms. Rimkus more generally." The District Court concluded that, as to each category of undisclosed evidence, the evidence was not material under the standard articulated in Strickler and thus that Spencer's Brady claim failed.

The District Court began by addressing the government's failure to turn over the call log. The District Court stated that this evidence of the prosecutor's "close involvement in the Certificate's preparation" was, per the first prong of the Strickler test, "favorable" to Spencer. Specifically, the District Court concluded that had the call log been produced, the fact that it "describes . . . Ms. Rimkus's entry for April 3, 2014 [that] indicates that the AUSA told her about a mistake on the Certificate and where it came from . . . may well have called Ms. Rimkus's conclusions into doubt." That was so, the District Court elaborated, particularly given "the jury's question about chain of

- 16 -

custody, the proof of which depended largely on the documentation implicated in the instant motion."

The District Court also ruled in Spencer's favor as to Strickler's second prong, which concerned whether evidence of the call log's existence was suppressed, either willfully or inadvertently, by the government. In this regard, the District Court concluded that, although the United States Attorney's Office was not aware that the State Police Laboratory had a practice of logging calls from prosecutors, Rimkus was nevertheless "part of the prosecution team." As a result, "because [Rimkus] knew about the call log well in advance of Mr. Spencer's first trial, the government's 'we didn't know' excuse for failing to produce it to the defense fails."

But, in considering the final, prejudice prong of the Strickler analysis, the District Court ruled against Spencer, though "only by the narrowest of margins." The District Court explained that, "[a]t trial, the government presented evidence that the alleged drugs purchased from Mr. Morrison, in the transaction where Mr. Spencer stood watch, were assigned a control . . . number by the [BPD]." And, the District Court explained, "[t]he evidence showed that the sample bearing [that] control number was sent to Ms. Rimkus at the State Drug Lab, and that she analyzed the sample bearing that control number in preparing her original Drug Analysis Report." As a result, the

- 17 -

District Court emphasized that, regardless of any error by the BPD concerning the date of incident on the first form, the "control number associates the sample purchased from Mr. Morrison on March 20, 2013 with the sample that tested positive for crack cocaine at the lab."

Based on this reasoning, the District Court rejected Spencer's contention that there was a reasonable probability that the call log, had it been disclosed, would have been sufficient to undermine confidence in the jury's verdict. As the District Court put it, "no reasonable jury could have concluded, in light of the control number records, that the chain of custody was broken." For that reason, the District Court concluded that the "government's failure to produce the call log . . . [,] while questionable, was not an actionable Brady violation."

The District Court then turned to the government's failure to disclose additional evidence regarding Wortmann's communications with Rimkus that might have shed further light on the nature and extent of Wortmann's intervention. This additional evidence included firsthand accounts of the conversation between Wortmann and Rimkus, such as the one that Wortmann provided during the May 19 hearing before the District Court. The District Court concluded that this evidence, too, was favorable to Spencer, as it "might have been used to paint Ms. Rimkus as sloppy, at best, or a pawn of the prosecution, at worst." Likewise, "because the AUSA

himself was involved" in his communications with Rimkus "and necessarily knew they happened," the District Court concluded that the government willfully suppressed this evidence concerning Wortmann's communications with Rimkus.

Nevertheless, turning to the third prong of the Strickler test, which concerns the materiality aspect of Brady, the District Court ruled against Spencer. The District Court again emphasized the importance of the fact that the control number -- common to both the initial certificate (which had the wrong date of incident) and the corrected certificate (which had the right date of incident) -- matched the sample Rimkus analyzed to the substance obtained during Casallas's undercover purchase. Because "government counsel could have relied only upon the control number to show the chain of custody and integrity of Ms. Rimkus's test results[, n]o reasonable jury could have doubted that the sample delivered to Ms. Rimkus was the same one purchased from Mr. Morrison on March 20, 2013."

**D.**

Spencer contends, in challenging the Brady ruling below, that the undisclosed evidence -- whether considered individually or in combination -- would have enabled him to "cast doubt" on the link between Spencer and the sample Rimkus determined contained cocaine base. Spencer further contends that the disclosure of this evidence at trial would have rendered a different outcome

reasonably probable. Spencer thus contends that the District Court abused its discretion in denying his motion for a new trial on the ground that the undisclosed evidence was not material within the meaning of the third prong of the Strickler test for identifying a Brady violation.

In support of that contention, Spencer makes the following points. Spencer contends that the withheld evidence would have enabled him to "establish a lack of confidence" in the jury's verdict by sowing doubt as to whether the sample Rimkus tested was taken from the substance Casallas purchased from Morrison on March 20. In this regard, Spencer argues that the District Court wrongly relied on the "infallibility" of the control number. On Spencer's account, by showing the role that the prosecutor played in getting Rimkus to change the date of incident, the withheld evidence "could have shown the possibility that [the control number] was incorrect or even manufactured as well." Spencer also emphasizes the District Court's statement -- with respect to the second Strickler prong -- that the withheld evidence might have "been used to paint Ms. Rimkus as sloppy, at best, or a pawn of the prosecution, at worst."

In further support of his materiality argument, Spencer contends that the withheld evidence must be considered in light of a number of background features of the case. Spencer points, in particular, to Rimkus's relative inexperience, the time lag before

the submission of the sample by the BPD to the State Police Laboratory, and an additional error on the form that the BPD used to submit evidence to the State Police Laboratory, which concerned how the sample had been obtained by the BPD.[2] And, Spencer contends that his case is closely analogous to Flores-Rivera. There, we overturned a district court's conclusion, under Brady, that certain undisclosed evidence was not material. 787 F.3d at 20. Finally, Spencer notes, his first trial ended in a mistrial, with one of the jurors expressing significant unease with the case against Spencer. On this basis, Spencer argues that, had that first jury known of the undisclosed evidence, "there would have been a 'reasonable probability' of an acquittal."

**E.**

No doubt, Spencer could have seized on the evidence that Wortmann contacted Rimkus and had her correct one aspect of the certificate that she prepared -- the date of incident -- to suggest that the control number was "incorrect or even manufactured." But, we do not see what basis we have on this record for second-guessing the trial judge's conclusion about whether the lost opportunity to

---

[2] The BPD submitted the substance to the State Police Laboratory for analysis on September 17, 2013, approximately six months after Casallas made the purchase from Morrison. In addition, as the District Court noted, the submission form used by the BPD to submit the sample for analysis to the State Police Laboratory wrongly indicated that the "sample was the result of a '[s]eizure'" rather than a "'purchase,' which was another option on the form."

- 21 -

make that suggestion to the jury renders the nondisclosure material. See Flores-Rivera, 787 F.3d at 17 (noting that "[w]e do not . . . automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict" (quoting United States v. Dumas, 207 F.3d 11, 15 (1st Cir. 2000) (alterations in original)).

As we have explained, the undisclosed evidence shows no more than that Wortmann contacted Rimkus on April 3, 2014, in order to correct the date of incident on Rimkus's certificate of drug analysis. But, the record shows that it was a BPD officer, Flaherty, who, much earlier, on March 20, 2013, assigned a control number to the substance that Flaherty had received from another BPD officer, Keenan, and that the same control number that Flaherty had assigned was on the sample that Rimkus analyzed. In addition, the record shows that Rimkus relied, in preparing her certificates of drug analysis, on an error on the SP-295 form that the BPD used to submit evidence to the State Police Laboratory. The record does not show that Rimkus relied on any materials that the BPD prepared in the course of initially processing and logging Casallas's undercover purchase. In light of these aspects of the record, the District Court could reasonably conclude that the fact of the prosecutor's contact with Rimkus to correct the error regarding the date of incident on the initial certificate would

provide no more than a speculative basis for a conclusion that the control number itself was "incorrect or even manufactured."

We also conclude that it was reasonable for the District Court to conclude that, even if the control number was not "incorrect or even manufactured," the undisclosed evidence does not suffice to cast doubt on whether Rimkus, due to her alleged sloppiness or her ties to the prosecution, tested the wrong sample. Spencer does not dispute, after all, that Rimkus conducted her own, independent analysis of the substance that she then determined was cocaine base. And, nothing about the undisclosed evidence shows Rimkus to be sloppy or unprofessional in her work as a chemist for the State Police Laboratory. Rather, the undisclosed evidence just shows that Rimkus corrected erroneous information that had been given to her and that she had no reason to know was wrong. As a result, Spencer can only speculate that the substance that Casallas purchased from Morrison was "removed or changed between March 20, 2013, and September 2013 when it was allegedly tested by Ms. Rimkus."

We thus conclude that the District Court did not abuse its discretion, as it reasonably determined that the withheld evidence did not generate a reasonable probability of a different outcome at trial by calling into question the "chain of custody" of the sample or the "integrity of Ms. Rimkus's test results." And this conclusion is consistent with Flores-Rivera.

- 23 -

The undisclosed evidence in that case consisted of (1) a letter to the prosecutor from the star witness to the crimes, and (2) notes that the star witness had made concerning conversations he had had with two other cooperators while all three were in prison. We explained that the notes, which directly cast doubt on the star witness's testimony regarding whether he had coordinated with the other witnesses, constituted the "only evidence that would have eliminated the claim that the testimony [of the star witness and the other two cooperators] was entirely uncoordinated," and that the letter to the prosecutor "would have provided a uniquely colorful tool for both attacking [the star witness's] motivation and raising the prospect that [he] and the prosecutor were hiding something from the jury." Flores-Rivera, 787 F.3d at 20.

The undisclosed evidence in this case, however, does not cast doubt in any similarly direct way on any similarly key representation. As we have noted, Rimkus explained that she corrected the first certificate because "it was discovered" that the first certificate was wrong with respect to the date of incident on that certificate. But, the undisclosed evidence in no way undermines that representation. And, similarly, it is not clear how the undisclosed evidence casts meaningful (as opposed to merely speculative) doubt on the credibility of any other witness

- 24 -

who testified about any aspect of the case that bears on the integrity of the control number.

Moreover, while the testimony of the cooperating witnesses in Flores-Rivera that could have been undermined by the undisclosed evidence was "both essential to the convictions and uncorroborated by any significant independent evidence," id. at 18, Rimkus's testimony was not similarly uncorroborated. Rather, her testimony was supported by Casallas's and Keenan's testimony concerning the undercover drug purchase, Flaherty's testimony concerning the BPD's intake process, and the documentary evidence that indicated that the date of incident on the SP-295 form used by the BPD to submit the sample for analysis to the State Police Laboratory contained the error as to the date of incident that was then reproduced on Rimkus's initial certificate of drug analysis. Additionally, at both the trial and the evidentiary hearing on Spencer's Brady-based motion, Rimkus's testimony, although phrased in a manner that omitted mention of the AUSA's involvement, was consistent with Wortmann's.

To be sure, the District Court did state that the question of prejudice from the non-disclosure failed "only by the narrowest of margins." And Spencer was being retried following a mistrial. But, a district court receives no less deference in a close case than in a clear-cut one. In fact, it is in the close case that the fact that our review is for abuse of discretion

- 25 -

matters most.  We also agree with the government that it is hard to conclude anything about what might have been in the mind of Spencer's first jury -- let alone Spencer's second jury -- from the fact of the initial mistrial alone.  Thus, the fact that Spencer was being retried does not, at least on this record, lead us to conclude that we must substitute our own judgment for that of the District Court as to the resolution of what the District Court determined was a close call.[3]

## III.

Spencer makes three additional challenges on appeal.  We consider, and reject, each in turn.

## A.

Spencer contends, first, that the District Court erred in admitting certain testimony from both Keenan and Casallas that Spencer argues was unduly prejudicial to him.  In challenging the

---

[3] Spencer separately contends that his trial counsel provided ineffective assistance because he did not move for a mistrial or perhaps a voir dire of Rimkus after she testified.  But, "[w]e have held with a regularity bordering on the monotonous that ineffective assistance of counsel claims, which require a showing of deficient attorney performance and prejudice to the defendant, must originally be presented to, and acted upon by, the trial court . . . because an appellate court usually is ill-equipped to handle the fact-specific inquiry that such claims often require." United States v. Ofray-Campos, 534 F.3d 1, 34 (1st Cir. 2008) (citations omitted).  Spencer presents no developed argument as to how, in his words, "counsel's failures in this regard are [so] manifestly apparent from the record" such that we should depart from this "well-settled rule," id., and so we do not consider his ineffective assistance claim.

decision to allow these portions of testimony at trial, Spencer contends that Keenan and Casallas were "fact witness[es] entitled to testify as to what [they] observed Spencer doing," rather than qualified experts under Rule 702 of the Federal Rules of Evidence, who would have been permitted to contextualize Spencer's behavior in light of their professional experience.[4]  In consequence, Spencer argues that he was prejudiced by the admission of the portions of Keenan's and Casallas's trial testimony in which they testified not merely to what they observed during the incident but to their own views as to why, in light of their experience, what they observed evidenced the committing of a "tandem" drug crime. Thus, Spencer contends that these portions of testimony were "improperly admitted under Rule 403" of the Federal Rules of Evidence.[5]

With respect to Keenan's testimony, Spencer notes that, when asked whether, based on Keenan's "training and experience," it was "unusual for drug dealers to work in tandem out on the street," Keenan responded that it was not, in fact, unusual.  And,

---

[4] Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" under certain specified conditions.  Fed. R. Evid. 702.

[5] Rule 403 provides that the trial "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Spencer points out, Keenan then elaborated: "[t]hey often do it because . . . one guy may go out and gather the customers up while the person having the drugs doesn't have to expose himself as much."

With respect to Casallas's testimony, Spencer highlights the portion in which Casallas stated that he approached Spencer and "asked him if he was on" and then explained that being "on" is "street terminology usually used by drug users and drug dealers to determine whether the person is actually selling drugs." Spencer also objects to Casallas's testimony in which Casallas stated that Spencer was "scanning the area, looking at cars as they drove by," and then explained that he believed, on the basis of his experience, that Spencer was "doing counter-surveillance."

Even assuming, however, favorably to Spencer, that our review of the District Court's evidentiary rulings with respect to the challenged testimony is for abuse of discretion, United States v. Dunston, 851 F.3d 91, 96 (1st Cir. 2017), we see none here.[6]

---

[6] At trial, Spencer's counsel objected to Keenan's testimony as follows: "Objection, your Honor. Relevance." The District Court then overruled the objection. Later, Spencer's counsel objected to the first portion of Casallas's testimony that he now challenges on appeal without specifying a basis for the objection, and was again overruled. Spencer's counsel did not object to Casallas's testimony that Spencer was performing "counter-surveillance, although Spencer's counsel did object to Casallas's explanation of what Casallas meant by the term "counter-surveillance," and the District Court sustained that objection. The government contends on this basis that Spencer's challenges to the District Court's admission of these portions of Keenan's and

- 28 -

We have previously explained that opinion testimony by a witness who has not been qualified as an expert witness under Rule 702 may nevertheless be admissible under Rule 701 of the Federal Rules of Evidence provided that such testimony is "'rationally based on the perception of the witness,' [is] 'helpful to . . . the determination of a fact in issue,' and [is] 'not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009) (second alteration in original) (quoting Fed. R. Evid. 701). We have explained further that the touchstone for the admissibility under Rule 701 of such lay-opinion testimony is whether the testimony has the "potential to help the jury." United States v. Albertelli, 687 F.3d 439, 447 (1st Cir. 2012).

Under this standard, we have deemed testimony inadmissible "when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion." United States v. Etienne, 772 F.3d 907, 919 (1st Cir. 2014) (emphasis in original) (citations omitted). We have also explained that helpful testimony is typically "based on the lay expertise a witness personally acquires through experience, often on the job." United

Casallas's testimony may be reviewed only for plain error. Because we conclude that the testimony is admissible even on the more defendant-friendly abuse-of-discretion standard, we need not decide whether Spencer's counsel's objections were sufficient to preserve the arguments he asks us to accept.

States v. Vega, 813 F.3d 386, 394 (1st Cir. 2016) (quoting United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006)); see also United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005).  And, we have noted that "a police officer noticing patterns of behavior across criminal operations uses straightforward logic to conclude a defendant's behavior fits within that pattern and thus, does not need to be qualified as an expert."  Vega, 813 F.3d at 394.

Accordingly, we have upheld district court decisions to admit, under Rule 701, testimony from police officers "translating jargon common among criminals," even though not "traditional" lay testimony.  Albertelli, 687 F.3d at 446-47; see also Dunston, 851 F.3d at 96 (noting that "[a]pplication of Rule 701 in the drug-trafficking context is not novel: 'we have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language' for factfinders through lay opinion testimony" (quoting United States v. Rosado-Pérez, 605 F.3d 48, 56 (1st Cir. 2010))).

Applying these principles here, we conclude that the District Court did not abuse its discretion in admitting the objected-to testimony of either Keenan or Casallas, who, we note, were both available for cross-examination by Spencer.  See Vega, 813 F.3d at 394.  The record supportably reflects that both officers provided testimony about their observations of Spencer's behavior based on their accumulated experience as police officers

who have handled many drug cases.  United States v. Valdivia, 680 F.3d 33, 50-51 (1st Cir. 2012); see also Ayala-Pizarro, 407 F.3d at 28 (admitting certain testimony "about how drug points operate . . . because it was based on particularized knowledge that the witness had by virtue of his position as a police officer assigned to patrol the neighborhood" (citation and alterations omitted).    Specifically, Casallas testified that he had "personally purchased successfully over 100 undercover drug buys" during his nine years as a member of the BPD's Drug Control Unit, while Keenan testified that he, too, had spent ten years "exclusively as a drug investigator," including as an undercover officer.

Moreover, the record supportably shows that Keenan's and Casallas's testimony was helpful to the jury in interpreting Spencer's actions and statements.  Casallas and Morrison testified about certain patterns of conduct and speech that they, on the basis of their experience, believed to be typical of those engaged in selling drugs.  That testimony included the fact that Spencer and Morrison were working as a team, the meaning of being "on," and Spencer's behavior while Casallas and Morrison actually executed the transaction.  Thus, as in Valdivia, we conclude that the challenged "testimony was not so obviously within the jury's bounds of knowledge as to negate all probative value."  680 F.3d at 51.

**B.**

Spencer separately contends that the prejudice to him from the District Court's admission of the challenged testimony from Keenan and Casallas "was compounded by improper comments of the prosecutor in his opening and closing statements," during which the prosecutor four times referred to Spencer as a "drug dealer" and thus (in Spencer's view) improperly suggested that Spencer "had a propensity to deal drugs." Because Spencer did not object to these statements, our review is for plain error. United States v. Acosta-Colón, 741 F.3d 179, 198-99 (1st Cir. 2013). Thus, Spencer must show that "(1) an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of [the] proceedings." United States v. Kasenge, 660 F.3d 537, 541 (1st Cir. 2011) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

Spencer, however, cannot show the requisite prejudice from the remarks, see United States v. Kinsella, 622 F.3d 75, 84 (1st Cir. 2010) (on plain-error review, a defendant challenging a prosecutor's remarks as improper must "show[] both error and prejudice"), even were we to assume that the prosecutor's remarks rise to the level of a clear or obvious error. But see United States v. Wiley, 29 F.3d 345, 351 (8th Cir. 1994) (concluding that a prosecutor's remarks during closing argument, which referred to

the defendant as someone engaged in the "business [of] dealing drugs," "did not deprive [the defendant] of a fair trial . . . because the jury already was aware that [the defendant] was on trial for distribution of cocaine base"); cf. United States v. Marr, 760 F.3d 733, 742-43 (7th Cir. 2014) (rejecting on plain-error review a defendant's challenge to a prosecutor's comments to the jury during closing argument, in which the prosecutor referred to certain transactions at issue in the case "and asked, 'what legitimate business does that?  What legitimate business writes $1.3 million to cash and to a currency exchange?'" on the basis that the prosecutor's comments constituted "reasonable inferences from the evidence adduced at trial").

For one thing, "the fact that there was no contemporaneous objection or request for curative instructions . . . depriv[ed] the district judge of the opportunity to provide special or additional instructions with regards to the closing statements."  United States v. Castro-Davis, 612 F.3d 53, 68 (1st Cir. 2010).  For another, the District Court did explicitly instruct the jury that the arguments made to the jury during opening and closing argument by attorneys for the prosecution and defense were not evidence, and that the members of the jury "are the first and only judges of the facts in this case."  In light of our long-standing presumption that jurors follow instructions, United States v. Ponzo, 853 F.3d 558, 584 (1st Cir. 2017), and

- 33 -

against the backdrop of "the evidence presented at trial from multiple witnesses," "any potentially harmful effect from the prosecutor's closing was safeguarded by the district court's final jury instructions," Castro-Davis, 612 F.3d at 68 (citing United States v. Mejía-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)).

## c.

Finally, Spencer takes aim at the ruling by the Magistrate Judge responsible for presiding over the initial phase of Spencer's case in which the Magistrate Judge denied Spencer's request for discovery on his vindictive-prosecution claim. Spencer agrees with the government that a defendant must "advance some evidence tending to establish [a] vindictive-prosecution claim" before he can obtain discovery. United States v. Bucci, 582 F.3d 108, 113 (1st Cir. 2009). Spencer, however, contends that he satisfied this standard and thus that the Magistrate Judge erred in denying Spencer discovery. Specifically, Spencer points to the fact that he provided evidence that he filed a civil suit against Keenan in 2006 for assault and unlawful search and arrest, and that "grand jury testimony" showed that "Keenan . . . directed [Casallas] to approach Mr. Spencer on March 20, 2013," and thus "singled [Spencer] out" for arrest. Spencer further contends that the government's alleged Brady violation constitutes additional evidence tending to show a vindictive prosecution, "lend[ing]

credence to [Spencer's] allegations that he was specifically targeted for federal prosecution based on his prior lawsuit."

Our review of the Magistrate Judge's ruling is for abuse of discretion.  Id. at 114.  We find none.

Spencer concedes that he bears the burden of "connect[ing] any vindictive animus to those making the challenged charging decision in his case."  Id. (citation omitted).  The government, however, emphasizes that, from all that the record shows, federal authorities were unaware of Spencer's lawsuit against Keenan when they agreed to take Spencer's case from the Suffolk County District Attorney's Office.  And Spencer points to nothing in the record that would tend to show the contrary -- let alone that Spencer's lawsuit against Keenan motivated federal authorities to agree to prosecute Spencer.  Instead, tying Spencer's Brady claim to his vindictive prosecution claim, Spencer offers only speculation, suggesting that it is otherwise "inexplicable" that federal authorities would first have sought to try him, and later to withhold evidence from him.  But, such speculation is plainly insufficient to satisfy the standard we laid out in Bucci.  Id. at 114 ("To obtain discovery, [a defendant] must do more than simply identify a potential motive for prosecutorial animus."  (citation omitted)).

Moreover, although the government admits that the particular drug transaction at issue in this case involved a small

quantity of cocaine base, the government notes that Wortmann stated in an affidavit -- and Spencer does not dispute -- that Spencer had "close to 100 entries on his Board of Probation Records" and had been "convicted of approximately 19 crimes going back to 1990." It is thus not inexplicable that federal authorities took Spencer's case.[7]

For all of these reasons, Spencer's challenge regarding his vindictive prosecution claim fails.

**IV.**

For the foregoing reasons, we **affirm** the rulings below.

---

[7] We note, too, as Spencer acknowledges, that the relevant undisclosed evidence was not available to the Magistrate Judge at the time of the Magistrate Judge's ruling on Spencer's discovery request, and Spencer never sought to renew his motion.