# United States Court of Appeals
## For the First Circuit

No. 23-1946

DICKENS ETIENNE,

Petitioner, Appellant,

v.

MICHELLE EDMARK,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Thompson, Circuit Judges.

Michael G. Eaton, with whom Donna J. Brown and Wadleigh, Starr & Peters, P.L.L.C. were on brief, for petitioner.
Elizabeth C. Woodcock, Senior Assistant Attorney General, Office of the Solicitor General, New Hampshire Department of Justice, with whom John M. Formella, Attorney General, and Anthony J. Galdieri, Solicitor General, were on brief, for respondent.

October 21, 2024

**LYNCH**, **Circuit Judge**.  Petitioner Dickens Etienne was convicted by a jury in New Hampshire state court on November 23, 2004 for the January 28, 2004 first-degree murder of Larry Lemieux. A conviction of first-degree murder under New Hampshire law requires the state to show that the defendant's acts were "deliberate and premeditated."  N.H. Rev. Stat. Ann. §§ 630:1-a(I)(a), 630:1-a(II).  Etienne admitted that he had shot Lemieux, but argued that he had acted in self-defense or in defense of another and so had not acted with premeditation.  Etienne was sentenced to life without parole.

Roughly two weeks after Etienne's conviction, the prosecution disclosed to Etienne's defense counsel in the murder case, for the first time, a proffer letter dated June 30, 2004 from other prosecutors in that office who recommended a suspended sentence as to drug charges against Jose Gomez in an unrelated case.  Gomez was an important prosecution witness, among others, at Etienne's trial.

Etienne then moved for a new trial, arguing that this was exculpatory evidence which undercut Gomez's testimony and the failure to produce the proffer letter violated Etienne's due process rights under both the state and federal constitutions. See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also State v. Laurie, 653 A.2d 549, 552 (N.H. 1995).  The state trial court found

that the failure to disclose the proffer letter to Etienne had not prejudiced Etienne and denied his motion for new trial.

The New Hampshire Supreme Court affirmed that denial and Etienne's conviction, specifically finding, for a number of reasons described further below, that Etienne had not been prejudiced under the New Hampshire case law setting even stricter standards than Brady.[1]  See State v. Etienne, 35 A.3d 523, 553 (N.H. 2011).

On December 13, 2018, Etienne filed a petition for habeas corpus in the U.S. District Court for the District of New Hampshire.  The district court denied relief, which denial Etienne now appeals.[2]  See Etienne v. Edmark, No. 18-cv-1156-SM, 2023 WL 7220756 (D.N.H. Nov. 2, 2023).

The issue before us is whether Etienne has met his burden of showing that the New Hampshire Supreme Court decision that he

---

[1] "[T]he New Hampshire constitutional right to present all favorable proofs affords greater protection to a criminal defendant [than the federal Brady standard]." Laurie, 653 A.2d at 552.

[2] The district court acted after remand from this Court. The district court initially denied Etienne's petition in 2020, which Etienne then appealed to this Court.  See Etienne v. Edmark, No. 18-cv-1156-SM, 2020 WL 6161421 (D.N.H. Oct. 21, 2020).  With respect to Etienne's Brady claim, we granted Etienne's request for a certificate of appealability, vacated the district court's judgment, and remanded to the district court because we saw "no indication on the docket that [the trial] transcripts ever were filed" with the district court as required by Rule 5(c) of the Rules Governing U.S.C. § 2254 Cases.  Etienne v. Edmark, No. 20-2067, 2023 WL 3063494, *1-2 (1st Cir. Apr. 20, 2023).

was not prejudiced as required under <u>Brady</u> (and New Hampshire law) "involved an unreasonable application of[] clearly established Federal law" under the deferential standards of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254(d)(1). We affirm the denial of habeas relief.

**I.**

Because Etienne has conceded at oral argument that he does not challenge the New Hampshire Supreme Court's factual determinations,[3] we describe the relevant findings as recounted by that court. See <u>Scoggins</u> v. <u>Hall</u>, 765 F.3d 53, 54 (1st Cir. 2014). We describe first the New Hampshire Supreme Court's explanation of the proffer letter at issue:

> On December 7, 2004, the defendant's trial counsel obtained from the Attorney General's Office the proffer letter, dated June 30, 2004, between Susan Morrell and Gomez's counsel, Adam Bernstein. Attorney Morrell explained the letter's contents to the defendant's trial counsel as follows:
>
> Mr. Gomez did not receive any consideration for his "cooperation" in the matter of <u>State</u> v. <u>Dickens Etienne</u>. At no time was he offered, or

---

[3] Etienne also cannot argue that the state court based its decision on an "unreasonable determination of the facts" because he has not preserved any challenge to the state court's factual determinations. See <u>Castillo</u> v. <u>Matesanz</u>, 348 F.3d 1, 12 (1st Cir. 2003) (arguments not made in habeas petition or certificate of appealability are waived); <u>see also</u> <u>Gomes</u> v. <u>Silva</u>, 958 F.3d 12, 19 n.4 (1st Cir. 2020)("[T]he special prophylaxis of section 2254(d)(2) applies only to determinations of basic, primary, or historical facts." (quoting <u>Ouber</u> v. <u>Guarino</u>, 293 F.3d 19, 27 (1st Cir. 2002))).

> given any consideration in connection with Etienne's case.
>
> The consideration to which I refer in the [June 30, 2004] letter was to a proffer conducted on May 7, 2004 at the Manchester Police Department. The subject matter of our interview pertained to Mr. Gomez's knowledge of illegal drug activities in the Manchester area.

Etienne, 35 A.3d at 547.

Etienne had contended that this letter showed that Gomez's testimony that he had not received such a plea deal on the drug charges was false and that it showed Gomez was biased. Id. at 546. The New Hampshire Supreme Court held that under New Hampshire's stringent disclosure rules, the prosecutors in Etienne's case should have disclosed the letter, although they did not know of it and it had been issued by other prosecutors in the office. Id. at 549-50.

Applying New Hampshire law, the court held that the proffer letter was favorable to Etienne because it "would have strengthened the defense's argument and given greater weight to its assertions that Gomez had, in fact, received a plea deal." Id. at 548. The court then assumed that the proffer letter was "knowingly withheld" and shifted the burden to the state "to prove, beyond a reasonable doubt, that the undisclosed evidence would not have affected the verdict." Id. at 550 (quoting State v. Shepherd, 977 A.2d 1029, 1035 (N.H. 2009)). The New Hampshire Supreme Court held that Etienne was not prejudiced for two reasons:

(1) "the undisclosed evidence would not have altered defense counsel's strategy, which centered on impeachment of Gomez" and

(2) "the evidence would not have altered the outcome because even if the impeachment had caused the jury to disregard Gomez's testimony altogether, there was overwhelming additional evidence of premeditation before the jury."

Id. at 550-51.

In support of the first reason, the court explained that "Gomez's cooperation with the State to receive consideration in an unrelated case . . . was only one of the areas in which the defense attempted to discredit him, and the remaining avenues of impeachment were unaffected by the undisclosed information." Id. at 551. In support of the second reason, the court explained that "many witnesses testified to the events leading up to the homicide, to the circumstances of the homicide, and to the defendant's actions thereafter," and recounted this additional evidence of premeditation in detail. Id. at 552-53. The court concluded that "[t]he jury was thus presented with overwhelming evidence, aside from Gomez's testimony, that the defendant purposely, with deliberation and premeditation, killed Lemieux." Id. at 553.

## II.

"Our review of a district court's denial of a petition for habeas corpus is de novo." Watkins v. Medeiros, 36 F.4th 373, 383-84 (1st Cir. 2022).

Under de novo review, we turn directly to the AEDPA

question. "AEDPA 'demands that a federal habeas court measure a state court's decision on the merits against a series of peculiarly deferential standards.'" Ayala v. Alves, 85 F.4th 36, 54 (1st Cir. 2023) (quoting Porter v. Coyne-Fague, 35 F.4th 68, 74 (1st Cir. 2022)). Specifically, under 28 U.S.C. § 2254(d), "a writ of habeas corpus . . . shall not be granted . . . unless" the challenged state court decision was:

> (1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(Emphasis added). The "unreasonable application of clearly established Federal law" prong has been further defined as follows. "To meet [this] standard, a [petitioner] must show far more than that the state court's decision was 'merely wrong' or 'even clear error'"; rather, "[t]he [petitioner] must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" Shinn v. Kayer, 592 U.S. 111, 118 (2020) (first quoting Virginia v. LeBlanc, 582 U.S. 91, 94 (2017), then quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)); see also Porter, 35 F.4th at 75.

### III.

To make out a Brady claim, the Brady petitioner must

show not only that evidence "favorable to the accused . . . [was] suppressed by the State" but also that "prejudice . . . ensued" from the suppressed evidence. Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Healy v. Spencer, 453 F.3d 21, 26 (1st Cir. 2006) ("As a federal court sitting in habeas, . . . we utilize the [federal] Brady standard of prejudice."). A defendant is prejudiced under Brady "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Turner v. United States, 582 U.S. 313, 324 (2017) (quoting Cone v. Bell, 556 U.S. 449, 469-70 (2009)); see also United States v. Spencer, 873 F.3d 1, 6 (1st Cir. 2017) (quoting Turner, 582 U.S. at 324). "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." Spencer, 873 F.3d at 6 (quoting Turner, 582 U.S. at 324).

Under our deferential review, the New Hampshire Supreme Court's second reason for holding that Etienne was not prejudiced -- that there was overwhelming independent evidence of premeditation from witnesses other than Gomez before the jury -- alone suffices to affirm the denial of habeas relief.[4]

---

[4] In his opening brief, Etienne seems to cursorily suggest that timely disclosure of the proffer letter might have altered defense counsel's strategy, but he does not explain which aspects of defense counsel's strategy would have changed or how those changes would have altered the record in this case. Because he does not do so, any contention that the New Hampshire Supreme Court

Under New Hampshire law, the offense of first-degree murder requires the state to show that: (1) the defendant "cause[d] the death of another" and (2) did so "[p]urposely." See N.H. Rev. Stat. Ann. § 630:1-a(I)(a). New Hampshire law defines "purposely" to mean that "the actor's conscious object is the death of another, and . . . his act or acts in furtherance of that object were deliberate and premeditated." Id. § 630:1-a(II).

> [S]ufficient proof of [deliberation and premeditation] does not require evidence that the defendant devoted time to quiet reflection, but may rest on inferences reasonably drawn from the "character of the weapon employed, the force and number of blows inflicted, the location and severity of the wounds, the place of the crime, previous remarks and conduct indicating preparation, subsequent acts and statements, and every circumstance having a legitimate bearing upon the subject . . ."

State v. Therrien, 533 A.2d 346, 350 (N.H. 1987) (quoting State v. Sadvari, 462 A.2d 102, 104 (N.H. 1983)); see also State v. Patten, 813 A.2d 497, 499-500 (N.H. 2002).

In light of the record evidence, the New Hampshire Supreme Court concluded:

> Because the record supports the trial court's

---

did not consider the additional evidence of premeditation it recounts in light of this hypothetical altered record is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st. Cir. 1990) (finding waiver when counsel fails to "put flesh on [an argument's] bones" by merely "advert[ing] to [the argument] in a perfunctory manner, unaccompanied by some effort at developed argumentation"). Additionally, like the district court, we do not address the argument that Etienne's habeas petition is untimely because his petition fails on the merits.

finding that "while Gomez's testimony may have bolstered the State's case, it was not of such a nature that further impeachment by the proffer letter would have altered the result," we affirm the trial court's denial of the defendant's motion for new trial based on the State's alleged failure to disclose exculpatory information.  In light of the fact that the State Constitution affords greater protection than does the Federal Constitution, see Laurie, 139 N.H. at 330, 653 A.2d 549, we reach the same result under the Federal Constitution.

Etienne, 35 A.3d at 553.

Etienne has not shown -- as he must -- that the New Hampshire Supreme Court's decision on Brady prejudice was "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'"  Shinn, 592 U.S. at 118 (quoting Harrington, 562 U.S. at 103); see also Turner, 582 U.S. at 324; Strickler, 527 U.S. at 281-82; Spencer, 873 F.3d at 6.  Indeed, under our highly deferential review, we see no basis to conclude the New Hampshire Supreme Court "unreasonably applied" Brady.  See McLaughlin v. Corsini, 577 F.3d 15, 20 (1st Cir. 2009) (holding that state court's no-prejudice determination was not "unreasonable application" of Brady); Healy, 453 F.3d at 27 (same); McCambridge v. Hall, 303 F.3d 24, 42 (1st Cir. 2002) (en banc) (same).[5]

_____

[5] Etienne makes an incorrect argument that the New Hampshire Supreme Court did not address his Brady claim because its opinion relied largely on New Hampshire cases.  The argument is meritless. Where, as here, the state court "used a standard more favorable to [the defendant] than the federal standard, we consider the Brady

The New Hampshire Supreme Court reasonably concluded, after a detailed review of the record, that "there was overwhelming additional evidence of premeditation before the jury." Etienne, 35 A.3d at 551. This included evidence from many different witnesses other than Gomez[6] of: Etienne's relationship with Lemieux, including Etienne's own statements about Lemieux; Etienne's actions shortly before killing Lemieux; and Etienne's statements and actions after killing Lemieux.

The New Hampshire Supreme Court explained the relationships between many of the trial witnesses before the killing in the facts section of its opinion. Etienne lived in a second-floor apartment at 265 Central Street in Manchester, New Hampshire with his girlfriend Cameo Jette, his friend Israel Rivera, and Jette's friend, Jenna Battistelli. Id. at 530. One

_____

issue to have been 'adjudicated on the merits' within the meaning of 28 U.S.C. § 2254(d)." Healy, 453 F.3d at 26. Further, Etienne failed to raise it in either his federal habeas petition or his certificate of appealability. See Castillo, 348 F.3d at 12 (arguments not raised in habeas petition or motion for certificate of appealability are ordinarily waived).

[6] Although not stated in the New Hampshire Supreme Court's opinion, the record shows that twenty-three prosecution witnesses other than Gomez testified at Etienne's trial: Enoch Willard, Geoffrey Smith, Nicole Almonte, Autumn Millette, Bernadette Bimbris, Detective Robert Freitas, Gary Desruisseaux, Terry Ouellette, Steven Ostrowski, David Garcia, Tina Gobis, Jenna Battistelli, Jennifer Hannaford, Nancy Vaillancourt, Israel Rivera, Dia Etienne Jeanlys, Detective John Patti, Amy Hannaford, Dr. Thomas Andrew, Latorre Johnson, Heather Metsch, Detective Carlo Capano, and Cameo Jette.

floor above, in that same apartment building, lived Jennifer Hannaford. Id. Jennifer Hannaford's sister Amy Hannaford was then pregnant with Etienne's child, and Jennifer Hannaford had three children with Louis Pierre, with whom Etienne was "particularly close." Id. Etienne was also friends with Jose Gomez, Michael Roux, and David Garcia. Id. "[Etienne] and his friends were also acquainted with Larry Lemieux and Lemieux's friend, Latorre Johnson." Id.

As the New Hampshire Supreme Court explained, "[p]rior to the homicide, the relationship between [Etienne] and Lemieux was tense." Id. at 552. As the court explained earlier in its opinion, in December 2003, Lemieux had "hit on" Jette, denigrating Etienne by asking Jette "what somebody like [her] was doing with somebody like [Etienne]." Id. at 530. Etienne had forbidden Lemieux from entering Etienne's apartment when he was not present "because of Lemieux's interaction with Jette." Id. at 552; id. at 530. "In January 2004, Lemieux told Tina Gobis, whom he was dating," id. at 530, "that either [Etienne] or Pierre was going to kill him," id. at 552. "Battistelli overheard [Etienne] and Pierre discussing that Lemieux would 'get his some day.'" Id.

The New Hampshire Supreme Court then turned to "[t]he night before the murder," explaining that "[Etienne] was upset when he learned that Lemieux had defied him by going to his apartment and had attempted to sexually assault Jennifer

- 12 -

Hannaford."[7]  Id.  Etienne called "people in Manchester who might know where Lemieux could be found.  Gobis testified that [Etienne] and Lemieux had argued on the telephone, and that Lemieux told her that [Etienne had] 'threatened to kill him.'"  Id.

The court next recounted Etienne's actions on the day of the killing.  Garcia testified that Etienne was "upset and angry" that day and that he believed "[Etienne] had lied to Lemieux about when [Etienne and his friends] would be arriving at Central Street because he wanted to get there before Lemieux did."[8]  Id.  Garcia also testified that Etienne had called Gomez and asked him to go to Central Street.  Id.; id. at 531.  Once at Central Street, "[Etienne] retrieved his .9-millimeter Ruger pistol, Pierre obtained a gun and Rivera gave Pierre bullets."  Id. at 553; id. at 531.  Etienne and his friends "behaved as though they expected a fight: Pierre told Jennifer Hannaford to take the children upstairs shortly before the murder, and Roux was reluctant to go outside to meet Lemieux."  Id. at 553.

The court explained the events immediately preceding the shooting.  "Garcia testified that [Etienne] had been holding the

---

[7] As the New Hampshire Supreme Court explained in the facts section of its opinion, Etienne was not home in Manchester at the time, because he had gone to Foxwoods Casino in Connecticut with Pierre, Roux, and Garcia.  Id. at 530.

[8] The court earlier explained that Lemieux had told Pierre on the phone that he was going to Central Street.  Id. at 531.

gun in his left hand when Lemieux arrived, that he moved the gun to his right hand, said something to Pierre in Haitian Creole, and then moved behind Lemieux and shot him." Id. Johnson and Rivera testified "that the defendant moved behind Lemieux, pointed the gun at him, and then shot him." Id. The medical examiner testified that Lemieux died immediately because the bullet severed his spinal cord. Id.

The New Hampshire Supreme Court described the events that occurred after the killing. Etienne wrote letters to Jette and Amy Hannaford after his arrest "in which he told [them] that he had known that Lemieux was going to be killed." Id.; id. at 532. Further, Detective John Patti testified, "without objection," to statements made by Gomez to him during a February 2004 interview, in which Gomez narrated a conversation between himself and Etienne where the men "discussed bringing Lemieux to Foxwoods for a 'wood ride,' meaning they would murder Lemieux during the ride, and that the defendant had said, 'It's a wrap,' meaning that Lemieux was going to be killed."[9] Id. at 553.

Etienne does not and cannot challenge the facts cited by the New Hampshire Supreme Court in support of its conclusion and

---

[9] Though Detective Patti testified to statements made by Gomez, Etienne did not argue before the New Hampshire Supreme Court or the district court, and does not argue before us, that the jury would have weighed this testimony any differently had the proffer letter been introduced at trial. Any such argument is waived. See Castillo, 348 F.3d at 12.

recounted above.  Against this record evidence, we see no basis to conclude that the New Hampshire Supreme Court's no-prejudice determination was an unreasonable application of Brady.

**IV.**

We **affirm** the district court's denial of habeas relief.